Christopher MASTROVINCENZO (a.k.a."Mastro"), and Kevin Santos (a.k.a. "NAC" or "NAK"), Plaintiffs,

v.

The CITY OF NEW YORK; Michael R. Bloomberg, Mayor; the New York City Department of Consumer Affairs; Commissioner Gretchen Dykstra; the New York City Police Department; Commissioner Raymond W. Kelly; the Department of Parks and Recreation of the City of New York; and Commissioner Adrian Benepe, Respondents.

No. 04 Civ.412 VM.

United States District Court, S.D. New York.

April 7, 2004.

Andrew David Kaizer, Wilmer Cutler Pickering, L.L.P., Douglas Lasdon, New York City, for Plaintiffs.

## Decision And Order

MARRERO, District Judge.

In this motion for a preliminary injunction, plaintiffs Christopher Mastrovincenzo ("Mastrovincenzo") and Kevin Santos ("Santos," and collectively "Plaintiffs") challenge the application to them of the licensing requirement contained in the General Vendors Law, New York City Administrative Code § 20–452 *et seq.* (the "Ordinance" or the "General Vendors Law"). Plaintiffs offer for sale in public places without a license articles of clothing that they individually decorate with text and images in what they label a graffiti style. Due to a limit on the number of permits by the Department of Consumer Affairs ("DCA") pursuant to the Ordinance, Plaintiffs have been unable to obtain a license to operate as street vendors in New York City. Mastrovincenzo has been arrested twice and Santos has been told to shut down his display for operating as a vendor without a license.

Plaintiffs have moved for a preliminary injunction to prevent the City of New York (the "City"), the DCA, the New York City Police Department, the Department of Parks and Recreation, and the mayor and the respective department commissioners (collectively, the "Defendants") from enforcing the licensing requirement against them on the grounds that it violates the First Amendment to the United States Constitution, a permanent injunction that the City and DCA previously entered into following other litigation raising similar issues, and the New York State Constitution. Because the Court agrees that Plaintiffs are likely to succeed on the merits of their claims, the Court grants Plaintiffs' motion for a preliminary injunction.

## I. BACKGROUND

The General Vendors Law regulates the sale of goods and services, other than food, in the public spaces of the City of New York. The Ordinance requires any person who "hawks, peddles, sells, leases or offers to sell or lease, at retail" any non-food goods or services in a public space in the City of New York to obtain a general vendor's license from the DCA. Admin. Code §§ 20–452, 453. The Ordinance exempts from the license requirement any person who vends exclusively "newspapers, periodicals, books, pamphlets or other similar written material".[1]  *Id.* § 20–453. A license costs two hundred dollars and is valid for one year. *See id.* § 20–454. The licensee may apply for renewal of the license each year, and the DCA commissioner must renew the license provided that the applicant complies with all administrative requirements, such as payment of taxes and the renewal fee, and the licensee has not committed any violation which could serve as the basis for a revocation of the license. *See id.* §§ 20–457, 459. The Ordinance places restrictions on the size and locations of vendors' displays.[2]  *See id.*

---

1. Honorably discharged members of the United States armed forces are also exempt from the license requirement. N.Y. Gen. Bus. Law § 32 (McKinney 1994).

2. For example, vendors may not: operate their business on any sidewalk that is less than twelve feet wide; occupy more than eight linear feet of public space parallel to a

§ 20–465. These restrictions operate on all vendors, regardless of whether they are required to possess a license. *See id.* §§ 20–452(b), 465.

The Ordinance caps the number of general vendor's licenses available citywide at 853, the number of licenses that were in effect on September 1, 1979. *See id.* § 20–459(a); New York City Local Law No. 50 (1979). The waiting list for a general vendor's license has approximately 8000 names. Any person who engages in vending goods or services without a license and who is not exempt from the license requirement may be exposed to civil and criminal penalties. *See* Admin. Code §§ 20–468, 469, 472. Nonexempt unlicensed vendors may be charged with a misdemeanor that is punishable by a fine of between $250 and $1000 or imprisonment for up to three months, or both, and their goods may be seized and subjected to forfeiture. *See id.* § 20–472.

The New York City Council indicated that it authorized these penalties against unlicensed vendors, and enacted the Ordinance, because:

the public health, safety and welfare are threatened by the unfettered use of city streets for commercial activity by unlicensed, and therefore illegal, general vendors. Such illicit operations have a pernicious effect on both the tax base and economic viability of the City. Unlicensed general vendors do not pay taxes, often sell stolen, defective or counterfeit merchandise and siphon business from reputable, tax-paying commercial establishments. The practice of selling their wares on the most congested streets of the City impedes the flow of pedestrian traffic, causing the overflow

of traffic and, at worst, it creates the potential for tragedy.

(New York City Local Law 40/1988 § 1.)

In the mid–1990s, several artists challenged the Ordinance's requirement that they obtain a license—an essentially impossible task—before selling their work in public spaces. *See Bery v. City of New York,* 97 F.3d 689 (2d Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997). The Second Circuit ruled that the Ordinance's license requirement unconstitutionally infringed on the artists' First Amendment rights to sell their work in public places, and granted the artists' motion for a preliminary injunction against the enforcement of the licensing requirement as to them. *See id.* at 698–99. After the Second Circuit granted the preliminary injunction, the parties in *Bery* entered into a Permanent Injunction on Consent (the *"Bery* Injunction"). Under the *Bery* Injunction, the *Bery* defendants, including the City and the DCA, are:

permanently enjoined from enforcing Admin. Code § 20–453 against any person who hawks, peddles, sells, leases or offers to sell or lease, at retail, any paintings, photographs, prints and/or sculpture, either exclusively or in conjunction with newspapers, periodicals, books, pamphlets or other similar written matter, in a public space[.]

(Permanent Injunction on Consent dated October 21, 1997, *Bery v. City of New York,* No. 94 Civ. 4253 (S.D.N.Y. Oct. 30, 1997).)

Plaintiffs in the present case are both trained freelance artists who employ what they label a "graffiti" style of painting. Mastrovincenzo received a degree in archi-

---

curb; place their pushcarts or display stands within twenty feet of an entrance to any building, theater, arena or other place of public

assembly; or occupy a bus stop or taxi stand or cover any ventilation grill or subway access. *See* Admin. Code § 20–465.

tecture with a minor in graphic design and presentation from the Pratt Institute of Technology in 2002. Since then, he has been commissioned to design and paint storefronts, commercial signs and business cards, among other projects. He also designs apparel and creates wood carvings and architectural models. He has been painting for over ten years. Santos studied communications, film and fine arts at Fordham University. He began painting in graffiti in the 1970s under the instruction of more experienced artists. His work appeared in a documentary film on graffiti art and has been displayed in several galleries in New York. After the terrorist attacks on September 11, 2001, Santos co-founded an organization called "Ground Zero Arts," which is dedicated to creating memorial artwork addressing the attacks.

Plaintiffs describe graffiti style as "a highly stylized form of typography" which "involves developing and refining the formation of an alphabet and the techniques to render it." (Declaration of Christopher Mastrovincenzo dated January 7, 2004 ("Mastrovincenzo Decl.") at ¶ 6.)

Both Plaintiffs paint articles of clothing, especially hats, using paint pens and spray cans, and sell them from sidewalk displays. Plaintiffs do not work from templates. Instead, each item is unique and individually produced. Some works contain text, others depict public figures such as the President or contain logos or designs. Each Plaintiff offers for sale his own works and will also custom-paint a blank article of clothing at a customer's request. Neither sells blank, unadorned hats. Each charges between $10 and $100 per hat. Both set their prices based on the complexity of the design and effort involved in completing it. They may spend from fifteen minutes up to an hour to complete one item.

Neither Plaintiff has a general vendor's license. Both applied for licenses from the DCA in 2002 but were denied because of the City's freeze on issuing new licenses. Undeterred, Plaintiffs each established sidewalk displays of their work for sale. Mastrovincenzo has been arrested twice for acting as a general vendor without a license. The charges against him were dropped both times, but not before his pieces were auctioned off following the first arrest and he spent eight hours in jail after the second arrest. Santos has apparently not been arrested but was told by City police officers to shut down his display. Santos states that rather than risk arrest by continuing to sell his works without a license, he has arranged for licensed vendors to sell his completed works on commission.

Through a series of correspondence and discussions between counsel for Plaintiffs and the DCA during the summer and fall of 2003, Plaintiffs attempted to obtain permission from the DCA to sell their items in public spaces without a license. The DCA determined that the hats and other items were not exempt from the licensing requirements because they did not communicate a political or religious message and instead were simply merchandise. Plaintiffs then filed this lawsuit. They claim that the enforcement of the licensing requirement against them violates the *Bery* Injunction, the First and Fourteenth Amendments to the United States Constitution and article 1, sections 8 and 11 of the New York State Constitution.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

The Court may grant a preliminary injunction to stay government action taken in the public interest pursuant to a statutory scheme when the moving party establishes that it will suffer irreparable harm absent the injunction and that it is likely to succeed on the merits of its claim. *See*

*Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989).

█ It is well settled that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Consequently, the parties in the present case direct their energies to Plaintiffs' likelihood of success on the merits of their claims.

## B. *FIRST AMENDMENT CLAIM*

Plaintiffs argue that the application to them of the Ordinance's licensing requirement violates their rights to freedom of speech and expression under the First Amendment. Defendants counter that the items Plaintiffs sell do not contain expressive or communicative elements and are therefore indistinguishable from other merchandise that is not protected by the First Amendment.

### 1. *Scope of First Amendment Protection*

█ As Defendants correctly recognize, the First Amendment protects the sale of expressive merchandise. *See City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 756 n. 5 & 768, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *Bery,* 97 F.3d at 695–96. Newspapers, books, audiotapes and all other expressive items are no less protected than they would otherwise be under the First Amendment merely because they are sold for profit. *See City of Lakewood,* 486 U.S. at 756 n. 5, 108 S.Ct. 2138 ("[T]he degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."); *Ayres v. City of Chicago,* 125 F.3d 1010, 1014 (7th Cir.1997) (stating that items protected by First Amendment "do not lose their protection by being sold rather than given away").

The issue in the present case is thus whether the items Plaintiffs offer for sale are expressive merchandise. Mere commercial goods—*i.e.,* items that do not convey an expressive element – are not protected by the First Amendment. An individual wishing to sell non-expressive merchandise in public in the City would therefore need a general vendor's license. *See Al–Amin v. City of New York,* 979 F.Supp. 168, 173 (E.D.N.Y.1997) (finding no First Amendment protection for sale of perfume oils and incense); *People v. Saul,* 2004 WL 324439, 2004 N.Y. Slip Op. 24044 at *4, 3 Misc.3d 260 (2004) (non-expressive merchandise not entitled to First Amendment protection and therefore subject to license requirement); *see generally, Bery,* 97 F.3d at 694–96 (emphasizing need to distinguish expressive from non-expressive items for purposes of First Amendment protection).

Written and verbal materials do not possess a monopoly on communication and expression. The *Bery* court emphasized that "[v]isual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise or pamphlet or other writing, and is similarly entitled to full First Amendment protection." *Id.* at 695. Moreover, because written and verbal communications are tied to the language in which they are recorded, their power to convey may be far more limited than non-verbal communications. *See id.* at 695. Some means of expression have a way to speak to us without words, and enable us to perceive what the artist may have had in mind simply by their quality to evoke. To understand Goya's message in "Third of May, 1808" or Picasso's in "Guernica" does not demand mastery of Spanish. The viewer needs no Berlitz course to appreciate Ansel Adams or contemplate a Calder. Consequently, on this view, what is art may be defined and found in this two-way interchange, even in silence—a correspon-

dence at the meeting point of recognition and understanding between an artist stirred enough by creative fluids to give expression to a thought through a chosen medium, and the audience that receives the idea so conveyed.

■■■ *Bery* emphasized that visual art with an expressive message is entitled to just as much protection as written materials. The case at bar requires the Court to explore the frontiers of *Bery* to delineate a border between protected, expressive art and unprotected, non-expressive merchandise. As the Second Circuit instructed, "[c]ourts must determine what constitutes expression within the ambit of the First Amendment and what does not." *Id.* at 696. The *Bery* court spoke in terms of paintings, photographs, prints and sculptures, but clearly held a much broader conception of what qualifies as artistic expression. *See id.* at 694–96. To be sure, not all aesthetically pleasing designs possess sufficiently expressive qualities to qualify for First Amendment protection and thereby become exempt from the Ordinance's license requirement. The works of "the jeweler, the potter and the silversmith," for example, may contain artistic merit. *Id.* at 696. That a bowl or bracelet catches the eye, however, does not necessarily bring the item within the realm of First Amendment protection. Instead, the item must manifest some communication, that is, it must express some idea conceived and conveyed from the artist, to merit First Amendment protection. *See Spence v. State of Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

Like Proteus, expression can take many, sometimes fleeting or improbable forms. "It is possible to find some kernel of expression in almost every activity a person undertakes –for example, walking down the street or meeting one's friends at a shopping mall –but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989).

*Stanglin* involved an inquiry into the expressiveness of conduct rather than speech and to that extent it differs from the present case. But it and similar decisions discussing the means of determining whether conduct is sufficiently expressive to receive First Amendment protection are instructive in the present inquiry. Not all conduct is sufficiently expressive to merit First Amendment protection, but actual speech, as when written or spoken, is always communicative or expressive and thus virtually always protected. *See, e.g., Virginia v. Black,* 538 U.S. 343, 358, 360 n. 2, 123 S.Ct. 1536, 1547, 1548 n. 2, 155 L.Ed.2d 535 (2003); *Zalewska v. County of Sullivan,* 316 F.3d 314 (2d Cir.2003). In and of itself, visual artwork such as that now at issue before this Court is not conduct, but not all forms of visual artwork are always necessarily so communicative or expressive that no further inquiry is needed to determine whether they merit First Amendment protection. Consequently, the reasoning that courts employ to determine whether conduct is sufficiently expressive to receive protection is instructive in an examination of physical items.

No bright line separates those items that are sufficiently expressive to be worthy of First Amendment protection from those that are not. The Supreme Court has traditionally evaluated the expressiveness of *conduct* by asking whether there was an intent to convey a particularized message and whether, given the surrounding circumstances, there was a great likelihood that viewers would understand the message. *See Spence,* 418 U.S. at 410–11, 94 S.Ct. 2727.

In *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515

U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), the Supreme Court seemed to revise that standard when it stated that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.* at 569, 115 S.Ct. 2338 (internal citations omitted); *see also, Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 158–61 (3d Cir.2002) (noting that *Hurley* "eliminated" the particularized message requirement). But in post-*Hurley* decisions, the Second Circuit has continued to evaluate the expressiveness of conduct by requiring an "intent to convey a 'particularized message' along with a great likelihood that the message will be understood by those viewing it." *Zalewska,* 316 F.3d at 319–20. In *Church of the American Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 205 n. 6 (2d Cir.2004), the Second Circuit expressly rejected the notion that *Hurley* altered the expressiveness test for evaluating conduct. The *Kerik* Court stated that "[w]hile we are mindful of *Hurley's* caution against demanding a narrow and specific message before applying the First Amendment, we have interpreted *Hurley* to leave intact the Supreme Court's test for expressive conduct." *Id.*

The Second Circuit has not indicated how its "particularized message" standard provides the protection that the Supreme Court would give to Pollock, Schoenberg or Carroll, but if Pollock's "Lavender Mist" conveys a particularized message that is likely to be understood by the viewer, it is difficult to conceive of many works of art that would fail that test. To this extent, the expressiveness test for conduct is perhaps somewhat ill-suited to determine the expressive quality of art.

Unlike conduct, which very often has a dominant non-expressive purpose, genuine art is specifically produced by an artist attempting to convey a particularized message. Although walking across the street may contain some "kernel" of expression, in nearly all instances it is done for the purpose of getting to the other side of the road rather than to express a message. Art, however, is intentionally produced by the artist to communicate some idea or message. The purpose of the First Amendment is not to protect neutral conduct or conduct that does not manifest expression. *See Black,* 123 S.Ct. at 1548 n. 2 (noting that "the First Amendment protects *symbolic* conduct as well as pure speech") (emphasis added). But it is more likely than not that art will contain an expressive message. Thus, although conduct is appropriately analyzed for First Amendment purposes on the basis of whether it expresses, to some extent, a particularized message, visual artwork is perhaps subject to a less defined standard of expressiveness.

Admittedly, however broad the standard for identifying expressiveness may be, not everything labeled or hawked as art falls within it. In *People v. Saul,* 2004 WL 324439, 2004 N.Y. Slip Op. 24044, 3 Misc.3d 260 (2004), the New York City Criminal Court rejected a claim that decks of playing cards bearing photographs of Iraqi military or political figures and their names and titles were sufficiently expressive to receive First Amendment protection and exempt their seller from the City's license requirement. The court found "nothing artistically noteworthy about the photographic images on the cards, nor do they constitute the seller's own artistic endeavor." *Id.* 2004 N.Y. Slip Op. 24044 at *4. After determining that the cards lacked artistic elements, the court considered and rejected the argument that the cards were a form of nonverbal expression. *Id.* The court reasoned

that "there is nothing about these cards which, reasonably interpreted, communicates ideas, opinions, emotions or a point of view. They do not glorify or condemn the war, demonize the characters, honor the Coalition forces, hail war heroes or memorialize the fallen." *Id.* The court characterized the playing cards as "nothing more than the means to play a game and/or, at most a collectible" and emphasized that collectibles, as distinct from art, are simply merchandise undeserving of First Amendment protection. *Id.*

In addition, the line between merchandise and art may at times be blurry. The sale of mass-produced red, white and blue striped shirts or stars and stripes neckties does not merit First Amendment protection. A mere aesthetically pleasing design employed by a fashion designer solely to market clothing, however creatively conceived and executed, ordinarily does not sufficiently convey a message to merit First Amendment protection.[3] The vendor wishing to sell such items on the streets of New York City must obtain a license.

Closer to the line, while Edvard Munch himself would not need a license to sell "The Scream" (or prints of it) from a sidewalk table, a vendor wishing to sell the popular neckties featuring the painting's distraught figure undoubtedly would need a license. The necktie merchant uses the Munch design not as art in itself, but to sell ties. His end is starkly commercial, with not a tinge of purpose conveying even collateral or residual artistic expression. But Munch did not paint "The Scream" to market pieces of cardboard. Moreover, the sidewalk necktie vendor may sell hundreds of ties with different patterns and designs, none of which he created personally, and, in selling those with the Munch design, he is not necessarily – indeed, is not likely – attempting to convey to his customers his particularized feelings of despair, agony or alienation in the modern world.[4] Similarly, miniature figurines of the Statue of Liberty require a license to be sold on the sidewalks of Times Square because, although they duplicate a work of art with profound expressive content, they are primarily created and sold to memorialize a visit to New York City rather than to convey the producer's or vendor's expressive message.[5] *See id.*

3. That is not to say that fashion may never be art or that fashion does not contain expressive elements. Clothing is often the most effective means a person has to convey to others the person's moods, emotions, and individuality. Moreover, as in the present case, further analysis may be needed when the clothing itself tilts towards speech. *See, e.g., Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (ruling that First Amendment prohibits prosecution of individual for wearing in public a jacket bearing a vulgar expression of opposition to the military draft).

4. The vendor need not always be endeavoring to convey the message expressed in what he is selling to receive First Amendment protection. The sidewalk bookseller or newspaper vendor does not have to be the author or editor of his wares, nor must he preach the message of anything on his display table, to be exempt from the Ordinance's licensing re-

quirement. *See* Admin. Code § 20–453. All written materials are presumed to be expressive. But items such as those that Plaintiffs produce do not carry the same presumption, and so the Court must inquire into their expressiveness. The vendor's role in creating the items and his intent in selling them must therefore be considered when the items at issue are not presumed expressive.

5. That is not to say that in an appropriate context a would-be vendor wishing to sell only Statue of Liberty figurines that he or she has altered for an expressive purpose by, for example, adding a blindfold over her eyes or the word "Peace" on her chest would likewise need a permit to offer such items for sale on the sidewalk. In particular circumstances, such alterations would likely remove the items from the souvenir trinket category and place them well within the realm of expression.

Altering the hypothetical above slightly more to fit the facts of the instant case, what if Munch, as his signature wares, chose to paint, at the behest of passersby, his wailing form on t-shirts and ties and to sell them from a sidewalk table? Would his crafts be classified as mere unlicensed merchandise and subject him to penalties? As applied in the case before the Court, Defendants' theory would compel that the hypothetical Much creations would not be works of art, but ties, simply goods for sale, and merely because the medium with the message is a t-shirt, tie or hat rather than a four-cornered canvas. To this interpretation Defendants might reply: Ah, but Munch is Munch. And besides, in the example given, anyone could quickly discern the stylized figure in the tie design and readily tell that it must be saying *something*. This logic, a derivative of the I–know–it–when–I–see–it test, may be easily dispatched. Should it be a prerequisite for art to be art, that the artist express his thoughts through traditional, perceptually accessible means? The long history of ideas, which records infamous instances of persecution of creative expression, would answer compellingly, for any society that values free speech as much as ours, with an emphatic "No." Civilization has traveled too far down the road in the evolution of art as embracing the whole spectrum of human imagination for the law to countenance a classification of an artist's design as art only when imparted in conventional shapes and forms sufficiently familiar or acceptable to a government licensor.

Defendants interpret the Second Circuit's decision in *Bery* to mean that "the relevant inquiry is not whether an item could possibly be labeled 'art,' but whether that item 'always communicates an idea or concept to those who view it.'" (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction dated February 18, 2004 ("Def.Opposition"), at 8, quoting *Bery*, 97 F.3d at 696.) But although Defendants are correct that the mere possibility that an item could be labeled "art" does not necessarily convey First Amendment protection on the item and therefore exempt it from the City's licensing requirement, they misread *Bery's* distinction between expressive art and merchandise. The *Bery* court did not state that jewelry, pottery or metalwork could never receive First Amendment protection. Instead, it indicated that it was unwilling to provide blanket protection for *all* jewelry, pottery and metalwork because such items do not always communicate an idea or concept to the viewer. For these and other items, as distinct from paintings, photographs, prints and sculptures, courts must conduct case-by-case evaluations to determine whether the work at issue is sufficiently expressive.

Just as expression is not limited to the written and spoken word, see *Bery*, *id.* at 694–96, neither is nonverbal expression restricted to paintings, photographs, prints and sculptures. The totem poles and carvings of the Tlingit, Haida and Tsimshian tribes of British Columbia and southeastern Alaska, the masks of central and western African peoples, and the burn-marked didgeridoos of Australian Aborigines are, in their own way, as expressive as any Mark Rothko painting, Andy Warhol print or Henry Moore sculpture. Indeed, the former may contain no less particularized messages and may be equally likely to be understood by their viewers as the latter.

But the Court today need not analyze the expressiveness of a didgeridoo or compare a miniature totem pole to a miniature replica of the Statute of Liberty. Plaintiffs seek to sell hats and other items that they personally decorate with designs that either spring from their own creative impulses or from the wishes of their customers and are then executed in the designer's distinct style. Defendants, on the other

hand, argue that the items are merchandise and are not sufficiently expressive to warrant First Amendment protection and exempt Plaintiffs from the Ordinance's licensing requirement. The Court finds that an examination of the items at issue is therefore necessary to resolve the dispute.

### 2. Plaintiffs' Items for Sale

■ Plaintiffs assert that they work in an artistic mode known as graffiti style. Some residents of New York City and other large urban areas may associate the word "graffiti" with urban blight and conjure up negative images of spray-painted words and names defacing subway cars, building walls and park benches. Plaintiffs paint on clothing and other items for sale to customers and do not vandalize public or private property.

New York's graffiti, in its modern inner-city form, began to appear in the late 1960s and early 1970s as illicit lettering on building walls and then subway cars.[6] Reviewing the development of contemporary urban graffiti, some commentators in the field have noted that graffiti writing was, and remains, a means for members of underrepresented minorities to express themselves in large urban environments.[7] Painting on trains and buildings, according to this view, enabled these individuals to spread their voice over a far wider area than they could accomplish by almost any other means. The text gradually became more stylized and evolved into what could be characterized as a form of calligraphy. Some graffiti writers eventually abandoned text and turned to elaborate representational or abstract murals. Over time, graffiti displays acquired recognition and acceptance with some audiences, gained inclusion in museum exhibits on urban art and culture, and were offered for sale in art galleries.

Employing the distinct graffiti style, Plaintiffs produce individualized, hand-painted items of clothing for sale to customers. In some instances, Plaintiffs use their own designs and ideas, and on other occasions Plaintiffs will customize an item according to a customer's request.[8] Mastrovincenzo's work includes decorated baseball caps with such words as "Boston," "Unique," or "Uptown" (in a stars-and-stripes motif) painted across the front; jackets with the words "Sheba" or "Oh, So Fresh" across the back; a shirt with "G*wiz" across the front; and sneakers with designs, words and numbers. Santos's work includes decorated baseball caps with words and designs such as "Bronx" painted in army camouflage colors and accompanied by a partial subway map of the Bronx; "Art is not a crime" in white on a black hat; "1984" in green and purple on a background of vertical black rectangles and black cloud-shaped splotches; and several representational scenes.

---

**6.** Graffiti is arguably the world's oldest form of expression, if the cave paintings in Europe, some dating to 15,000 B.C., draw from the same inspiration in similarly—depending upon the eye of the primitive beholder—either adorning or defacing common quarters or public spaces. The present description of graffiti is taken from the statements of Lydia Yee, Senior Curator at The Bronx Museum of the Arts in the Bronx, New York (Declaration of Lydia Yee dated January 13, 2004 ("Yee Dec.")) and Henry Chalfant, a sculptor, photographer and film maker who has documented graffiti art (Declaration of Henry Chalfant dated January 16, 2004 ("Chalfant Dec.")), which Plaintiffs submitted with their motion papers.

**7.** By reciting this history, the Court does not intend to suggest that all graffiti writing is protected by the First Amendment or that, where appropriate, vandalism of public or private property should not be punished criminally.

**8.** Plaintiffs submitted to the Court photographs of some of their items.

Defendants argue that Plaintiffs sell aesthetically pleasing merchandise, some or all of which may have some artistic elements, but that Plaintiffs' wares lack expressive or communicative elements and are therefore not protected by the First Amendment. They argue that an unprotected hat cannot acquire First Amendment protection merely through the addition of "decorative lettering which in and of itself is not expressive." (Def. Opposition at 9.) Defendants raise the possibility that if the Court concludes that Plaintiffs' work is protected under the First Amendment, then the simple addition of "flowers, hearts, fancy lettering or a checkerboard pattern" to any article of clothing would render that item protected First Amendment expression. (Def. Opposition at 10.)

Although Defendants do not expressly rely on this argument in their brief to the Court, in its decision that Plaintiffs' items were not exempted from the licensing requirement, the DCA stated that to receive First Amendment protection, an item must convey a political or religious message. (Letter from Susan Kassapian, DCA, to David Lesser, dated Oct. 30, 2003, attached as Exhibit 3 to Declaration of David Sapir Lesser, dated Jan. 16, 2004.) The Second Circuit in *Bery* expressly rejected what it termed this "myopic vision." *Bery*, 97 F.3d at 695. This Court will not belabor the point in similarly dismissing it. The subject or content of the message is virtually always irrelevant to whether an expressive item receives First Amendment protection.

Plaintiffs here argue that their work—including the actual text or design, the painting style, and the premise of painting on clothing to be sold on the street and worn around the city rather than on canvas to be hung in a museum or gallery – conveys themes and voices of underrepresented individuals and groups in a large urban environment. The text and designs may not endorse a presidential candidate or take an express position on domestic or international affairs, but art serves other roles as well. These items fall within the Second Circuit's broad view of "particularized message," and they are certainly within the broader standard for expression the Supreme Court adopted in *Hurley*. *See* 515 U.S. at 569, 115 S.Ct. 2338. Additionally, they are at least as likely to be understood by some viewers as a Jackson Pollock painting. The items in the present case are individually produced and hand-painted. They are not merely aesthetically pleasing designs used as a means of selling hats and jackets but rather they are expressive works of art, and are far different from the argyle socks that Defendants' fear may acquire First Amendment protection if the Court should rule in favor of Plaintiffs. Most of the items shown to the Court contain text that, on its own or through its style, is as expressive as any sidewalk calligrapher or Chinese-character painter, apparently neither of whom needs a license from the DCA to produce and sell their wares in the City's streets.[9]

Other considerations also affect the Court's decision. The *Bery* court noted that the Ordinance's cap on the number of licenses and the automatic renewal policy serves as a bar to any individuals wishing to exhibit and sell their goods or services on the streets of New York unless those items are protected by the First Amendment. *See Bery*, 97 F.3d at 697. Plaintiffs produce items that are sufficiently expressive in their own right to receive First Amendment protection. But even if the allegedly pedestrian hats and jackets that Plaintiffs offer for sale on their sidewalk tables today are only minimally expressive,

---

9. In some parts of New York City, vendors paint the name of a paying customer in Chinese characters. Defendants apparently do not require these vendors to obtain a license.

the Ordinance's licensing rule would deny Plaintiffs the chance to display and offer for sale the potential masterpiece they conceivably may produce at any moment that they may experience a flash of epiphanic inspiration.

The City alternatively concedes that some items that Plaintiffs offer for sale, such as individually-designed hats with the word "Peace" on them, may be sufficiently expressive to merit protection. But Defendants' application of the Ordinance's licensing requirement to Plaintiffs would impermissibly prevent Plaintiffs from displaying and selling those items along with their other wares that Defendants claim are insufficiently expressive.

Defendants argue that in selling hats, Plaintiffs are merely capitalizing on a popular trend and are no different from any other vendor selling the flavor of the month. But although Plaintiffs freely concede that they sell hats because there is a present demand for the items, Defendants miss the mark when they argue that this proves that Plaintiffs are merely commercially-driven vendors rather than artists offering protected expressive work. What Plaintiffs paint, not what they paint on, determines whether their work is sufficiently expressive to merit First Amendment protection.[10] *See Ayres,* 125 F.3d at 1017 (noting that message-bearing t-shirt is to peddler "what the *New York Times* is to the Sulzbergers and the Oschses—the vehicle of her ideas and opinions").

■ Because, as noted above, almost every object can conceivably be interpreted as having some expressiveness, there may be instances when the line between protected expression and unprotected merchandise will seem arbitrary. Such is the stuff of First Amendment law. Ultimately, myriad factors will guide any inquiry into whether a vendor's wares are sufficiently expressive to merit First Amendment protection. Among other criteria, the Court considers: the individualized creation of the item by the particular artist, the artist's primary motivation for producing and selling the item, the vendor's bona fides as an artist, whether the vendor is personally attempting to convey his or her own message, and more generally whether the item appears to contain any elements of expression or communication that objectively could be so understood. No one factor can control the outcome—as is the case in connection with many other judicial decisions concerning borderline issues, the criteria fit together to form a matrix. Certainly an item may be sufficiently expressive to fall within the realm of the First Amendment regardless of, for example, the educational background of its creator. At bottom, the purpose of the inquiry is to determine the degree of the item's expressiveness, which may best be accomplished by examining it in the light of objective considerations.

The City's licensing requirement was intended to catch within its net merchants engaged solely in commerce of ready-made goods that clog the sidewalks and compete unfairly with legitimate stores. Applied overbroadly, as Defendants would do, the Ordinance essentially would impose a chilling effect on genuine artists whose true calling is art and not commerce, and whose manifest purpose may be to create expression rather than markets, even if at times some of their work may skirt the line between expressiveness and merchandise. Such an extension of the licensing regime

---

10. The Court also notes that, to an extent, Plaintiffs' message is intertwined with the vehicle they use to express it. As described above, the modern graffiti style traces its roots to some urban dwellers' desire to spread their voices across a wide area by painting on a mobile or publicly visible medium such as building walls and trains. Plaintiffs' use of commonly-worn, highly-visible clothing is a natural extension of the style.

would force artists to confront an undue dilemma: either to quell their creativity or to risk arrest if they believe their work is sufficiently expressive to fall within the protection of the First Amendment. Freedom of expression is designed precisely to bar the government from compelling individuals into that speech-inhibiting choice. *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 871–72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

## C. *THE BERY INJUNCTION*

██ Plaintiffs argue that the *Bery* Injunction fully resolves this litigation independently of any constitutional inquiry. Under the *Bery* Injunction, the City and the DCA may not enforce the licensing requirement against "any person who hawks, peddles, sells, leases or offers to sell or lease, at retail, any paintings, photographs, prints and/or sculptures ... in a public space." (*Bery* Injunction.) Plaintiffs argue that they are artists who sell and offer to sell paintings, and the mere fact that they work on clothing rather than on canvas cannot remove them from the scope of the *Bery* Injunction.

Defendants do not directly address the *Bery* Injunction. They do not attempt to argue that Plaintiffs' works are not paintings. Instead, Defendants argue that Plaintiffs' works are not sufficiently expressive or communicative to be exempt from the licensing requirement. But the *Bery* Injunction imposes no requirement of expressiveness. Rather, it exempts from the licensing requirement sellers of *any* painting, photograph, print and/or sculpture. While Defendants may legitimately (though unsuccessfully) argue that Plaintiffs' works are not sufficiently expressive to merit First Amendment protection, such an argument is unresponsive to a claim that a particular artistic item falls within the protection of the broadly-written *Bery* Injunction. Whether Plaintiffs' decorated clothing is sufficiently expressive to re-

ceive protection under the First Amendment is a legitimate dispute that this Court resolves in favor of Plaintiffs. But, paradoxically, even if this Court were to rule, based on the photographs of Plaintiffs' works submitted to the Court, that Plaintiffs' works were *not* sufficiently expressive to merit First Amendment protection, under the *Bery* Injunction Plaintiffs would be free to offer for sale, without a license, the photographs of their works that they submitted as part of their motion papers.

A painting does not lose its definition as painting, or generally as art, when it appears on something other than a framed canvas. The original application of pigment to an article of clothing done for expressive reasons by an artist is no less a painting—in name, at least—than anything now exhibited on the walls of the Metropolitan Museum of Art. The *Bery* Injunction provides no definition for painting, photograph, print or sculpture. If Defendants wished to require an expressiveness element of paintings, prints, photographs and sculptures before exempting them from the licensing requirement, Defendants should have done so before agreeing to the *Bery* Injunction. As written, the *Bery* Injunction provides protection to Plaintiffs' works even if no factual dispute arose as to whether the First Amendment does.

Defendants understandably seek an easily-enforceable, bright-line rule to delineate protected from non-protected items, a standard that any police officer on the beat could readily administer. They argue that all items of clothing—and more broadly, all items of any kind other than traditional paintings, photographs, prints, or sculptures—should be subject to the licensing requirement. At oral argument, Defendants asserted that an original four-cornered canvas painting would manifestly

have constitutional protection but would promptly lose it if the painter folded the finished canvas into a hat. The First Amendment can not permit expression to be straightjacketed by such rigidity. The City, in the name of ease of enforcement, has essentially created a scheme that prevents Plaintiffs and others who engage in non-traditional forms of expression from conveying their message on the sidewalks of New York. Defendants' notion of protected non-verbal expression as limited to traditionally-presented paintings, photographs, prints and sculptures as judged by the police, and their alternative assertion that protected expression consists solely of written or verbal (rather then merely visual) commentary, are both far too limiting.[11]

The Court is also not persuaded that its ruling will create insurmountable enforcement difficulties for Defendants as to other sidewalk vendors who may assert that their wares are protected by the First Amendment. Apparently, in the eight years since *Bery,* only a handful of vendors have litigated First Amendment claims. The Court has enunciated several considerations that guide its decision. Moreover, as rulings from courts slowly accumulate, the body of cases will collectively instruct Defendants as to what types of items are subject to licensing and what items are exempt. Additionally, the Court today only resolves Plaintiffs' motion for a preliminary injunction. In such a procedural posture, the harm to the two Plaintiffs that would result from denying their motion— the silencing of their message—far outweighs the harm to the Defendants of allowing two more tables on the sidewalks of New York pending the final resolution of the merits of the case. *See Ayres,* 125

F.3d at 1013–15 (granting preliminary injunction involving similar vending ordinance and stating that defendant city's fear of flood of First Amendment lawsuits "would be relevant to the balance of harms from the granting of a preliminary injunction only if the injunction was being sought on behalf of a large number of the peddlers").

The Court's reasoning and conclusions above render it unnecessary for it to address Plaintiffs arguments under the New York State Constitution.

### III. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that the motion of plaintiffs Christopher Mastrovincenzo and Kevin Santos ("Plaintiffs") for a preliminary injunction is granted; and it is further

**ORDERED** that defendants The City of New York, Mayor Michael R. Bloomberg, The New York City Department of Consumer Affairs, Commissioner Gretchen Dykstra, The New York City Police Department, Commissioner Raymond Kelly, The Department of Parks and Recreation, and Commissioner Adrian Benepe, and each of them, and any person or entity acting in concert with them, are enjoined from enforcing New York City Administrative Code § 20–453 against Plaintiffs pending the final resolution of this litigation in this Court; and it is finally

**ORDERED** that the parties confer and submit by April 16, 2004 a proposed Case

---

**11.** This concern represents a difficulty with the *Bery* Injunction and with *Bery* itself, for they are arguably at once too broad and too narrow in their scope of protection. Conceivably, not every item of painting, photograph, print or sculpture that may be offered for sale on City sidewalks by any vendor is necessarily so expressive as to categorically merit First Amendment protection, but at the same time some objects outside those four categories may also be sufficiently expressive.

Management Plan to govern remaining pretrial proceedings herein.

**SO ORDERED.**