Christopher **MASTROVINCENZO a/k/a Mastro and Kevin Santos a/k/a Nak or Nac, Plaintiffs–Appellees,**

v.

**THE CITY OF NEW YORK, Michael R. Bloomberg, Mayor, Gretchen Dykstra, Commissioner of Consumer Affairs, New York City Department of Parks and Recreation, Defendants–Appellants.**

**Docket No. 04–2264–CV.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 10, 2005.

Decided: Jan. 5, 2006.

---

See also 339 F.Supp.2d 588.

Deborah A. Brenner (Barry P. Schwartz, of counsel; Michael A. Cardozo, Corporation Counsel of the City of New York, on the brief), New York, NY, for Defendants–Appellants.

David Sapir Lesser (Andrew D. Kaizer, Wilmer Cutler Pickering Hale and Dorr LLP, of counsel; Douglas H. Lasdon, Urban Justice Center, New York, NY, of counsel), Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, for Plaintiffs–Appellees.

Before: CABRANES and SACK, Circuit Judges, and KORMAN,* District Judge.

JOSÉ A. CABRANES, Circuit Judge.

We consider here whether the application of the licensing requirement of the City of New York (the "City") to unlicensed street vendors of clothing painted with grafitti violates either these vendors' rights under the First Amendment or a 1997 permanent injunction entered on consent of the City of New York (the "Bery injunction") by a district court in Bery v. City of New York, No. 94 Civ. 4253(MGC) (S.D.N.Y. Oct. 30, 1997). Because we hold that New York City's licensing requirement is a valid, content-neutral restriction on speech and because we do not classify plaintiffs' merchandise as "paintings" within the meaning of the Bery injunction, we conclude that plaintiffs have not demonstrated a "likelihood of success" on either claim. Accordingly, we vacate the order entered by the United States District Court for the Southern District of New York (Victor Marrero, Judge ) granting a preliminary injunction against defendants and remand the cause for further proceedings consistent with this opinion.

New York City's General Vendors Law ("GVL") regulates the sale of goods and services in public spaces for the purpose of preserving public health, safety, and welfare. New York City Administrative Code § 20–453—a provision of the GVL—aims to reduce congestion of city streets and sidewalks by requiring any person who "hawks, peddles, sells, leases or offers ... at retail" non-food goods or services to obtain a renewable general vendor's license from the Department of Consumer Affairs ("DCA"). N.Y.C. Admin. Code §§ 20–452(b); 20–453. Subject to a small number of exceptions, unlicensed vendors may be fined, imprisoned for up to three months, and/or forced to relinquish their merchandise. Id. § 20–472.

This administrative scheme was successfully challenged in the 1990s by vendors of paintings, photographs, prints, and sculptures, who asserted, inter alia, that New York City's licensing requirement unconstitutionally interfered with their First Amendment right to freedom of speech. Considering the matter at the preliminary injunction stage, we held in Bery v. City of New York, 97 F.3d 689 (2d Cir.1996), that (1) vendors of these traditional forms of art "always communicate some idea or concept" and are therefore presumptively "entitled to full First Amendment protection," id. at 696, and (2) that the City's licensing requirement violated the First Amendment as applied to plaintiffs because it was not narrowly tailored to the objective of reducing urban congestion, id. at 697–98. After this Court's decision in Bery and following the Supreme Court's denial of

---

* The Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

New York City's petition for a writ of certiorari, *City of New York v. Bery*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997), the City declined to proceed to a trial on the merits to resolve whether its fixed-license regime was narrowly tailored in light of the then-prevailing urban congestion rates and the availability of alternative channels for the sale of expressive merchandise. It also apparently declined to more "narrowly tailor" § 20–453 by adjusting the nature of the licensing requirement itself. Instead, the City consented to the *Bery* injunction and in doing so stipulated that it would no longer enforce § 20–453 against vendors of " 'any paintings, photographs, prints and/or sculpture.' " *Mastrovincenzo v. City of New York*, 313 F.Supp.2d 280, 283 (S.D.N.Y.2004) (quoting the *Bery* injunction).

We now consider whether either this Court's holding in *Bery* or the *Bery* injunction itself prevents the City of New York from enforcing its licensing requirements against plaintiffs, who are sidewalk purveyors of clothing painted with graffiti. In the course of resolving these legal questions, we decline the invitation of plaintiffs (and the District Court) to participate in colloquia on such interesting and lofty matters as the definition of "art," the Platonic form of a "painting," and whether a urinal can be a sculpture, *see* Decl. of Lydia Yee ¶ 17. Rather, we focus narrowly on the ruling of the District Court which preliminarily enjoined the City of New York from enforcing its licensing requirements against plaintiffs on the basis that such requirements violate both the First Amendment and the *Bery* injunction.

We hold, principally, that (1) the sale of clothing painted with graffiti is not necessarily expressive and therefore is not automatically entitled to First Amendment protection; (2) the sale of plaintiff's clothing nonetheless has a predominantly expressive purpose and therefore merits First Amendment protection; (3) New York City's licensing requirement is a content-neutral restriction on speech that is narrowly tailored to achieve the objective of reducing urban congestion; and (4) the *Bery* injunction's reference to "paintings" does not encompass clothing painted with graffiti.

Accordingly, we vacate the District Court's order granting a preliminary injunction against defendants and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I. New York City's General Vendors Law

New York City's General Vendors Law regulates the sale or offering for sale of non-food goods and services in the public spaces [1] of New York City. The GVL defines a "general vendor" as any person who "hawks, peddles, sells, leases or offers to sell or lease, at retail, [non-food] goods or services . . . in a public space." N.Y.C. Admin. Code § 20–452(b). At issue in this appeal is the provision of the GVL requiring, subject to certain exceptions described below, that "any individual [wishing] to act as a general vendor" must first obtain a general vendor's license from the

---

1. For purposes of the GVL, a "public space" is defined as "[a]ll publicly owned property between the property lines on a street as such property lines are shown on the City Record including but not limited to a park, plaza, roadway, shoulder, tree space, sidewalk or parking space between such property lines. It shall also include, but not be limited to, publicly owned or leased land, buildings, piers, wharfs, stadiums and terminals." N.Y.C. Admin. Code § 20–452(d).

DCA. *Id.* § 453.[2]  A one-year license costs two hundred dollars, *id.* § 20–454, and a licensee may apply each year for renewal of his license.  The DCA must approve a renewal request if the applicant has complied with certain administrative requirements, paid all applicable taxes and fees, and not committed any violation that would support the revocation of his license. *Id.* §§ 20–456, 457, 459.  City regulations specify that no more than 853 general vendor's licenses may be outstanding at any given time.  *See id.* § 20–459(a) (providing that "the maximum number of licenses permitted to be in effect" shall be "[t]he number of licenses in effect . . . on the first day of September, nineteen hundred seventy-nine"); *Bery,* 97 F.3d at 692 (describing the 1979 passage of Local Law 50, which amended the Administrative Code and fixed the permissible number of outstanding licenses at 853).  Because the permissible number of licenses has remained unchanged since 1979, and because current license-holders may annually renew their licenses, there is a substantial backlog of individuals seeking licenses.[3]

Due to a handful of statutory exemptions, the actual number of vendors legally selling non-food items at any given time exceeds 853. For instance, honorably discharged members of the United States armed forces who are veterans of any war or who served in the armed forces overseas are awarded licenses to vend publicly without being constrained by the license limit.  *See* N.Y. Gen. Bus. Law § 32 ("Every honorably discharged member of the armed forces of the United States, who is a resident of this state and a veteran of any war, or who shall have served in the armed forces of the United States overseas . . . shall [acquire] the right to hawk, peddle, vend and sell goods, wares or merchandise or solicit trade upon the streets [by obtaining a special veteran's license at no cost] . . . ."); *Bery,* 97 F.3d at 692; *Mastrovincenzo,* 313 F.Supp.2d at 282 n. 1.  Likewise, individuals selling "only newspapers, periodicals, books, pamphlets or other similar written matter" are exempted from the licensing requirement. *See* N.Y.C. Admin.  Code § 20–453; *Bery,* 97 F.3d at 692 (describing the 1982 passage of Local Law 33, which amended the Administrative Code to exempt vendors of written materials from the GVL's licensing requirement).  New York City has also agreed, under the terms of the *Bery* injunction, not to enforce its licensing requirement against individuals selling "paintings, photographs, prints and/or sculpture." *See* Background, II, *post.*

All general vendors, including those who are exempt from New York City's licensing requirement, must comply with the GVL's other restrictions concerning the size, location, and placement of vendors' displays. *See* N.Y.C. Admin.  Code § 20–452(b).  These regulations specify, *inter alia,* that vendors may not (1) operate on sidewalks less than twelve feet wide, (2) occupy more than eight linear feet parallel to a curb, (3) display their wares within twenty feet of an entrance to any "place of public assembly," (4) occupy a bus or taxi

---

**2.** New York City Administrative Code § 20–453 provides, in full, that
> [i]t shall be unlawful for any individual to act as a general vendor without having first obtained a license in accordance with the provisions of this subchapter, except that it shall be lawful for a general vendor who hawks, peddles, sells or offers to sell, at retail, only newspapers, periodicals, books, pamphlets or other similar written matter, but no other items required to be licensed by any other provision of this code, to vend such without obtaining a license therefor.

**3.** The District Court noted in April 2004 that "[t]he waiting list for a general vendor's license has approximately 8000 names." *Mastrovincenzo,* 313 F.Supp.2d at 283.

stand, or (5) obstruct subway access. *See id.* § 20–465 (specifying detailed restrictions on the time, place and manner in which licensed vendors may peddle goods and services); *see also Bery*, 97 F.3d at 692 (summarizing the provisions of § 20–465); *Mastrovincenzo*, 313 F.Supp.2d at 282 n. 2 (same).

A non-exempt vendor—*i.e.*, a non-veteran who sells any non-food goods other than written materials or artwork of the kind specified in the *Bery* injunction—who attempts to sell his wares in public spaces without a license is subject to civil and criminal penalties. He may be charged with a misdemeanor punishable by a fine of between $250 and $1,000, and/or imprisonment for up to three months, and his wares may be seized and forfeited. *See* N.Y.C. Admin. Code §§ 20–468, 469, 472.

It is not disputed that the New York City Council ("City Council")—which is broadly authorized to enact regulations designed to promote and protect the welfare of New York City residents, *see* Charter of New York City § 21 (outlining the broad legislative authority of the City Council); *see also Fisher Scientific Co. v. City of New York*, 812 F.Supp. 22, 25 (S.D.N.Y. 1993) ("The City Council and its committees possess and exercise all of the legislative power of the City of New York.")—enacted the licensing requirement for general vendors with a view toward promoting the public interest. According to the City Council,

> the public health, safety and welfare are threatened by the unfettered use of city streets for commercial activity by unlicensed, and therefore illegal, general vendors. Such illicit operations have a pernicious effect on both the tax base and economic viability of the City. Unlicensed general vendors do not pay taxes, often sell stolen, defective or counterfeit merchandise .... The practice of

> selling their wares ... impedes the flow of pedestrian traffic, caus[es] the overflow of traffic, and, at worst, it creates the potential for tragedy.

*Mastrovincenzo*, 313 F.Supp.2d at 283 (quoting New York City Local Law 40/1988 § 1).

## II. The *Bery* Case and the *Bery* Injunction

On June 9, 1994, a group of artists (the "*Bery* plaintiffs") brought suit against the City of New York for its refusal to exempt them from the licensing requirement of the GVL. The *Bery* plaintiffs were characterized first by the district court as "artists who sell their original paintings on public sidewalks and an artists' advocacy organization," *Bery v. City of New York*, 906 F.Supp. 163, 165 (S.D.N.Y.1995), and later by our Court as "individual artists engaged in painting, photography and sculpture and an artists' advocacy organization," *Bery*, 97 F.3d at 691; *see* Discussion, IV, *post*.

The *Bery* plaintiffs sought a preliminary injunction "prohibiting the enforcement against them of the ... General Vendors Law ... on the grounds that the application of the ordinance to their activities violate[d] their rights to freedom of expression and equal protection of the laws under the First and Fourteenth Amendments to the Constitution." *Bery*, 906 F.Supp. at 165. The district court denied their motion for a preliminary injunction, *id.* at 170, and a panel of our Court reversed that judgment, *Bery*, 97 F.3d at 699.

The *Bery* Court noted that "[v]isual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing," and concluded that the *Bery* plaintiffs' artwork

was "expressive merchandise"[4] that did not lose its status as protected speech merely because plaintiffs sought compensation for their art. *Id.* at 695–96. Despite a suggestion that the *Bery* plaintiffs' artwork was, by virtue of its status as visual art, automatically "entitled to full First Amendment protection," *id.* at 695, in fact, the Court's analysis proceeded in two distinct stages: first, the *Bery* plaintiffs' artwork was found to be sufficiently expressive to trigger First Amendment review of New York City's licensing requirement, *id.* at 696, and second, "the license requirement as it relate[d] to [the *Bery* plaintiffs] [was held to be] too sweeping to pass constitutional muster," *id.* at 697. In reaching the threshold conclusion—that the *Bery* plaintiffs' artwork was sufficiently expressive to trigger First Amendment review—the *Bery* Court explained that

> [w]hile [the crafts of the jeweler, the potter and the silversmith] may *at times* have expressive content, paintings, photographs, prints and sculptures, such as those [the *Bery* plaintiffs] seek to display and sell in public areas of the City, *always* communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection.

*Id.* at 696 (emphasis added).

Recognizing the inherent line-drawing problems associated with distinguishing among artwork with presumptively expressive content (such as that sold by the *Bery* plaintiffs), merchandise with potentially expressive content (such as "the crafts of the jeweler, the potter and the silversmith," *id.*), and merchandise with no expressive content, the *Bery* Court offered the following faint consolation to other judges who would be confronted with such matters in the future:

> Courts must determine what constitutes expression within the ambit of the First Amendment and what does not. This surely will prove difficult at times, but that difficulty does not warrant placing all visual expression in limbo outside the reach of the First Amendment's protective arm. Courts have struggled with such issues in the past; that is not to say that decisions are impossible.

*Id.* While the *Bery* Court foreclosed the categorical placement of "all visual expression" outside the reach of the First Amendment, it left open the "difficult" question of when the sale of assertedly artistic items constitutes protected speech under the First Amendment.

At a second stage of analysis, the *Bery* Court applied the First Amendment doctrine that governs content-neutral "time, place, and manner" restrictions on protected speech and held that the *Bery* plaintiffs could likely demonstrate that New York City's licensing requirement was not "'narrowly tailored to serve a significant governmental interest'" and did not "'leave[ ] open ample alternative channels for communication.'" *Id.* at 697 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). The *Bery* Court reasoned that New York City's licensing regime, by denying licenses to emerging artists such as the *Bery* plaintiffs, effectively "bar[red] an entire category of expression," *id.* at 697, and left plaintiffs with a lack of ample alternative venues for displaying their artwork, *id.* at 698.

---

4. The term "expressive merchandise" was used by the *Bery* Court as a kind of shorthand for the larger First Amendment question presented in that case—namely, whether the sale or dissemination of certain merchandise was predominantly expressive. *See Bery v. City of New York,* 97 F.3d 689, 695 (2d Cir.1996) (recognizing that "[t]he sale of protected materials is also protected").

Instead of contesting this preliminary determination in a trial on the merits or adjusting the substance of its licensing requirement, New York City consented to a permanent injunction (the *"Bery* injunction") prohibiting it from "enforcing [N.Y.C.] Admin. Code § 20–453 against any person who hawks, peddles, sells, leases or offers to sell or lease, at retail, any paintings, photographs, prints and/or sculpture, either exclusively or in conjunction with newspapers, periodicals, books, pamphlets or other similar written matter, in a public space[.]" Permanent Injunction on Consent dated Oct. 21, 1997, *Bery v. City of New York,* No. 94 Civ. 4253(MGC) (S.D.N.Y. Oct. 30, 1997); *see also Mastrovincenzo,* 313 F.Supp.2d at 283.

### III.   Plaintiffs and Their Merchandise

Plaintiffs Christopher Mastrovincenzo and Kevin Santos are "trained freelance artists," *Mastrovincenzo,* 313 F.Supp.2d at 283, with substantial artistic backgrounds.[5] In the words of the District Court, plaintiffs "offer for sale in public places without a license articles of clothing that they individually decorate with text and images in what they label a graffiti style." *Id.* at 282.

Plaintiffs describe their "graffiti style"—alternatively dubbed the "hip-hop" style—as "highly stylized typography, iconography, and pictorial representation ... [using] varying combinations of oil paints, spray paints, markers, and permanent paint pens" that they apply "primarily on hats and other items of clothing." Appellees' Br. at 3. Plaintiffs do not characterize their merchandise primarily as "clothing," but rather, as "artwork" on nontraditional canvases. *Id.* at 4. According to plaintiffs, "[e]ach piece is an individual work of art customized on the spot according to the client's request, and includes such things as names, characters, and pictures on the hats." Compl. ¶ 27. Plaintiffs further assert that they "charge different fees for their artwork based solely on the complexity and difficulty of the art they produce [and] do not charge anything for [the] items of clothing [themselves]." *Id.* ¶ 38.

In 2002, plaintiffs each applied for a vendor's license from the DCA, but their applications were denied. Plaintiffs nevertheless deliberately proceeded to establish sidewalk displays of their items, offering them for sale in public. On July 20, 2003, Mastrovincenzo was arrested for selling merchandise without a license and his goods were seized and later sold at auction. While the charges stemming from Mastrovincenzo's first arrest were ultimately dropped, he was arrested for the same offense on September 24, 2003 and allegedly incarcerated for eight hours. Santos was not arrested, but he was repeatedly instructed by New York City police officers to shut down his display. Thereafter, Santos arranged for his merchandise to be sold on commission through licensed vendors "rather than risk arrest." *Mastrovincenzo,* 313 F.Supp.2d at 284.

During the summer and fall of 2003, through correspondence and discussion initiated by their respective attorneys, plaintiffs sought the permission of the DCA to sell their merchandise on New York City sidewalks without a license. Those negotiations were unsuccessful, and plaintiffs thereafter filed this suit, seeking to enjoin the City from enforcing § 20–453 against them.

---

**5.**   Both plaintiffs have formal training in the arts: Mastrovincenzo earned a degree in architecture, with a minor in graphic design and presentation, from the Pratt Institute of Technology in 2002; Santos studied communications, film and fine arts at Fordham University. *Mastrovincenzo,* 313 F.Supp.2d at 283–84.

## IV. Plaintiffs' Complaint and the District Court's Decision and Order

Plaintiffs filed suit on January 20, 2004, alleging that defendants' refusal to permit them to sell their merchandise on public sidewalks violates (1) their rights under the First and Fourteenth Amendments, *see id.* ¶¶ 51–54; (2) the *Bery* Injunction, *see* Compl. ¶¶ 48–50; and (3) sections 8 and 11 of Article 1 of the New York State Constitution, *see id.* ¶¶ 55–56. Concurrent with the filing of their complaint, plaintiffs filed a motion for preliminary injunction.

The District Court granted plaintiffs' motion for preliminary injunction—barring defendants from enforcing § 20–453 against plaintiffs—in a Decision and Order dated April 7, 2004. The District Court began by observing that "the First Amendment protects the sale of expressive merchandise," *Mastrovincenzo,* 313 F.Supp.2d at 285, and then set about determining whether plaintiffs' items qualified as such.[6] The District Court then postulated that "[c]ivilization has traveled too far down the road in the evolution of art as embracing the whole spectrum of human imagination for the law to countenance a classification of an artist's design as art only when imparted in conventional shapes and forms sufficiently familiar or acceptable to a government licensor." *Id.* at 289. "Just as expression is not limited to the written and spoken word," the District Court elaborated, "neither is nonverbal expression restricted to paintings, photographs, prints and sculptures." *Id.* With regard to plaintiffs' merchandise, the District Court concluded that

[t]he items in the present case are individually produced and hand-painted. They are not merely aesthetically pleasing designs used as a means of selling hats and jackets but rather they are expressive works of art . . . . Most of the items shown to the Court contain text that, on its own or through its style, is as expressive as any sidewalk calligrapher or Chinese-character painter, apparently neither of whom needs a license from the DCA to produce and sell their wares in the City's streets.

*Id.* at 291.

Having found that plaintiffs' items qualify as "expressive works of art," the District Court nevertheless conceded that "almost every object can conceivably be interpreted as having some expressiveness," *id.* at 292, and that "not everything labeled or hawked as art [should be considered expressive art]," *id.* at 287. The District Court explained that, in the course of deciding whether the sale of plaintiffs' merchandise falls "within of the realm of the First Amendment," it took into account "myriad factors," *id.* at 292.

Among other criteria, the Court considers: [1] the individualized creation of the item by the particular artist, [2] the artist's primary motivation for producing and selling the item, [3] the vendor's bona fides as an artist, [4] whether the vendor is personally attempting to convey his or her own message, and [5] more generally whether the item appears to contain any elements of expression or communication that objectively

---

6. Although the District Court, like the *Bery* Court, framed its inquiry solely in terms of whether plaintiffs' graffiti clothing constitutes "expressive merchandise," *see Mastrovincenzo,* 313 F.Supp.2d at 285 ("The issue in the present case is thus whether the items Plaintiffs offer for sale are expressive merchandise. Mere commercial goods . . . are not protected

by the First Amendment."), we emphasize that the First Amendment protects speech rather than objects. Accordingly, the question presented is broader than that suggested by the District Court; we consider here whether plaintiffs' sale or dissemination of clothing painted with graffiti was predominantly expressive or not. *See* note 4, *ante.*

could be so understood. No one factor can control the outcome—as is the case in connection with many other judicial decisions concerning borderline issues, the criteria fit together to form a matrix. Certainly an item may be sufficiently expressive to fall within the realm of the First Amendment regardless of, for example, the educational background of its creator. At bottom, the purpose of the inquiry is to determine the degree of the item's expressiveness, which may best be accomplished by examining it in the light of objective considerations.

*Id.*

Fearful of imposing "a chilling effect on genuine artists whose true calling is art and not commerce," the District Court held that New York City's application of its licensing regime to plaintiffs violated their First Amendment rights to free speech. *Id.*

The District Court added that even if plaintiffs had not successfully challenged New York City's licensing requirement on First Amendment grounds, they could alternatively have prevailed on their *Bery* injunction claim. Citing what it described as the "broadly-written" language of the *Bery* injunction—that defendants City of New York and the DCA may not enforce § 20–453 against "any person who ... sells ... any paintings"—and the fact that the *Bery* injunction does not define the term "paintings," the District Court reasoned that "[a] painting does not lose its definition as painting, or generally as art, when it appears on something other than a framed canvas." *Id.* at 293.[7] Accordingly,

the District Court concluded that "[a]s written, the *Bery* Injunction provides protection to [p]laintiffs' works even if no ... dispute arose as to whether the First Amendment does." *Id.*

On April 21, 2004, defendants timely appealed from the District Court's order granting plaintiffs' motion for preliminary injunction. *See* 28 U.S.C. § 1292(a)(1) (providing appellate jurisdiction to review orders granting preliminary injunctions).[8]

## DISCUSSION

On appeal, defendants argue that the District Court erred by (1) ordering what was a "mandatory" (rather than "prohibitory") injunction without having conducted the proper "clear or substantial" likelihood-of-success analysis that is required for mandatory injunctions; (2) concluding that plaintiffs were likely to succeed on their First Amendment claim; and (3) determining that plaintiffs' wares are "paintings" within the meaning of the *Bery* injunction, which separately limits New York City's enforcement of § 20–453.

■ We review a district court's decision to grant a preliminary injunction for abuse of discretion. The District Court abuses its discretion "when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos*

---

7. On the contrary, the District Court went so far as to suggest that "[t]he original application of pigment to an article of clothing done for expressive reasons by an artist is no less a painting—in name, at least—than anything now exhibited on the walls of the Metropolitan Museum of Art." *Mastrovincenzo,* 313 F.Supp.2d at 293.

8. 28 U.S.C. § 1292(a) provides, in relevant part, that "the court of appeals shall have jurisdiction of appeals from ... interlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions ...."

*v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).

## I. Whether the Injunction Is "Mandatory" or "Prohibitory"

Defendants argue that the preliminary injunction requested in this case was mandatory, rather than prohibitory, and insist that the District Court should therefore have applied a more stringent test when evaluating whether to enter a preliminary injunction. *See* Appellants' Br. at 11–15.

█ A district court may enter a *prohibitory* preliminary injunction staying "government action taken in the public interest pursuant to a statutory or regulatory scheme" only when the moving party has demonstrated that (1) absent injunctive relief, he will suffer "irreparable injury," and (2) there is "a likelihood that he will succeed on the merits of his claim." *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989). Alternatively, a district court may enter a *mandatory* preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a "clear" or "substantial" likelihood of success on the merits. *No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir.2001) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir.1999)).

█ The District Court correctly treated plaintiffs' requested preliminary injunction as prohibitory and stated the proper test for determining whether such an injunction was warranted.

> The Court may grant a preliminary injunction to stay government action taken in the public interest pursuant to a statutory scheme when the moving party establishes [1] that it will suffer irreparable harm absent the injunction and [2] that it is likely to succeed on the merits

of its claim. [Because] [i]t is well settled that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury ... [the relevant issue in this case is] [p]laintiffs' likelihood of success on the merits of their claims.

*Mastrovincenzo*, 313 F.Supp.2d at 284–85 (internal quotation marks and citations omitted).

Defendants do not challenge the District Court's statement of the legal standard for granting prohibitory injunctions; rather, they insist that the requested preliminary injunction in this case was mandatory, rather than prohibitory. *See* Appellants' Br. at 13. In particular, defendants draw our attention to language in the Complaint ("[u]nless restrained by [the District] Court, [d]efendants *will continue* to enforce the Ordinance against [p]laintiffs," Appellant's Br. at 13 (quoting Compl. ¶ 47)) to argue that the licensing requirement is so regularly and consistently enforced that enjoining them from continuing to enforce it would, in effect, affirmatively force the City to change its conduct, thereby warranting the heightened mandatory injunction analysis.

In distinguishing between prohibitory and mandatory injunctions, we have noted that "[t]he typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. A mandatory injunction, in contrast, is said to alter the status quo *by commanding some positive act* ... [and] thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir.1995) (emphasis added). Accordingly, we first look to the terms of the injunction issued by the District Court, which reads:

ORDERED that defendants … are enjoined from enforcing New York City Administrative Code § 20–453 against Plaintiffs pending the final resolution of this litigation in this Court[.]

*Mastrovincenzo,* 313 F.Supp.2d at 294. On its face, the injunction clearly prohibits, rather than compels, government action by enjoining the future enforcement of § 20–453 against plaintiffs.

We are aware that "the distinction between mandatory and prohibitory injunctions is not without ambiguities or critics" and often leads to "distinctions that are more semantic[ ] than substantive." *Tom Doherty Assocs.,* 60 F.3d at 34 (internal quotation marks omitted) (alteration in original). Because "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms," *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 835, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), we have, on exceptional occasions, looked beyond the terms of the injunction itself, *see, e.g., SEC v. Unifund SAL,* 910 F.2d 1028, 1039–40 (2d Cir.1990) (imposing a "substantial showing of likelihood of success" requirement despite recognizing that "the order is prohibitory in form"). Here, however, we need not look beyond the terms of the injunction because it clearly does not command the City of New York or the DCA to perform any specific tasks.

If, as defendants suggest, the action prohibited in the instant case is so regular and consistent that the injunction must be designated as *de facto* mandatory, then the same would surely have been true in *Bery.* Notably, however, the *Bery* Court did not apply the heightened standard for mandatory injunctions to the injunction sought there. *See Bery,* 97 F.3d at 694.

A heightened "substantial likelihood" standard may also be required when the requested injunction (1) would provide the plaintiff with "all the relief that is sought" and (2) could not be undone by a judgment favorable to defendants on the merits at trial. *Tom Doherty Assocs.,* 60 F.3d at 34–35; *see, e.g., Beal v. Stern,* 184 F.3d 117, 122–23 (2d Cir.1999) (applying heightened standard where preliminary injunction would have permitted plaintiffs to hold large rally in public place, thereby rendering the dispute moot after entry of injunction). In this instant case, however, defendants have not shown that the injunction effects a particularly drastic or irreversible change in the status quo. Instead, the ultimate question of whether New York City may impose its licensing requirements on vendors of clothing painted with graffiti remains ripe for resolution on the merits, and the injunction did not irreversibly affect the rights of the parties.

In sum, we find no support in our case law for the proposition that an injunction that is prohibitory in form and that promises no severe or irreversible changes to the status quo may be recast as, or transformed into, a mandatory injunction simply by a reference to the predictability and certainty of the action enjoined. We therefore hold that the District Court did not err in evaluating plaintiffs' motion for preliminary injunction under the test for prohibitory injunctions, and we review the District Court's order granting that motion accordingly.

## II. The First Amendment Basis for the Injunction

At the outset, we underscore that we do not purport to resolve whether plaintiffs' wares fit within, or can be reconciled with, broader societal definitions of "art," a famously malleable concept the contours of which are best defined not by courts, but in the proverbial "eye of the beholder." Rather, in reviewing the District Court's

conclusion that plaintiffs would likely prevail on the merits of their claim that § 20–453 violates their First Amendment rights to free speech, we address (1) whether the District Court correctly concluded that the sale of plaintiffs' items was predominantly expressive and on that basis properly subjected New York City's licensing requirement to First Amendment scrutiny, and (2) whether the District Court properly determined that New York City's licensing fails an intermediate standard of scrutiny and therefore violates plaintiffs' First Amendment rights.

We are aware, of course, that objects themselves do not actually communicate—people do. That is, people may, by creating or selling artistic objects, engage in protected speech. *See, e.g., Bery,* 97 F.3d at 695. Accordingly, to resolve whether the First Amendment protects the sale of graffiti clothing, we must ultimately determine whether the disseminators of that clothing are genuinely and primarily engaged in artistic self-expression or whether the sale of such goods is instead a chiefly commercial exercise.[9] Because the most reliable means of resolving this difficult question is to examine objective features of the merchandise itself, however, we begin by analyzing whether plaintiffs' items, on their face, appear to serve predominantly expressive purposes. After evaluating the nature of plaintiffs' merchandise, we also take into account other factors such as plaintiffs' stated motivation for producing and selling their graffiti clothing. We stress that our threshold analysis of the objective characteristics of plaintiffs' wares should be understood not as a separate "expressive merchandise" test, but rather, as the first step of a larger inquiry into whether plaintiffs are engaged in protected speech—an inquiry which may also be informed by other, more subjective considerations.

### (A) Whether the sale of plaintiffs' graffiti-painted clothing is protected speech

For purposes of First Amendment coverage, "the Constitution looks beyond conduct," with its particularity-of-message requirement, is "ill-suited to determine the expressive quality of art." *Mastrovincenzo,* 313 F.Supp.2d at 286–87. ("[I]f [Jackson] Pollock's 'Lavender Mist' conveys a particularized message that is likely to be understood by the viewer, it is difficult to conceive of many works or art that would fail that test.").

We need not apply the doctrine of expressive conduct here because plaintiffs' conduct—namely, the sale and dissemination of their artistic objects—does not itself contain any expressive content. That is, plaintiffs' claims to First Amendment protection are not predicated on the theory that the act of distributing their artistic objects itself conveys a separate "particularized message" likely to be understood by an audience. Rather, plaintiffs assert that by disseminating to the public objects that they have invested with meaning through their artistry they are communicating directly through those objects—in short, that they are engaging in protected speech.

---

9. In determining whether the sale of plaintiffs' items constitutes protected speech for First Amendment purposes, the District Court briefly considered, but declined to apply, the First Amendment doctrine of expressive conduct. *See, e.g., Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (holding that the First Amendment protects conduct that is intended to convey a "particularized message" and that is likely to be understood by viewers); *Church of the Am. Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 205 n. 6 (2d Cir.2004) (acknowledging, in light of the Supreme Court's ruling in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), that while expressive conduct need not convey a message that is "narrow," "specific," or even "articulable," such a message must nonetheless be "particularized" and likely to be understood). Despite finding the expressive conduct test "instructive," the District Court concluded that "the expressiveness test for

written or spoken words as mediums of expression," *Hurley v. Irish–Am. Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), extending its protection to include, *inter alia,* "pictures, films, paintings, drawings, and engravings," *Kaplan v. California,* 413 U.S. 115, 119–20, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). In the words of the Supreme Court, if the First Amendment protected only expressive conduct "conveying a 'particularized message,' [it] would never reach the unquestionably shielded painting of Jackson Pollack, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley,* 515 U.S. at 569, 115 S.Ct. 2338 (internal citation omitted). Of equal importance to plaintiffs, "the degree of First Amendment protection" to which speech is entitled "is not diminished merely because the . . . speech is sold rather than given away." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 756 n. 5, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *see also Ayres v. City of Chicago,* 125 F.3d 1010, 1014 (7th Cir. 1997) (noting that items "do not lose their [First Amendment] protection by being sold rather than given away.").

■ As noted, we held in *Bery* that "paintings, photographs, prints and sculptures . . . always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection." *Bery,* 97 F.3d at 696. Beyond this statement, however, there is a notable dearth of precedent—both within our Circuit and beyond—offering guidance as to when a product should be said to serve predominantly expressive purposes, and in turn, when its sale or dissemination is protected under the First Amendment.[10] As the District Court acknowledged, "the mere possibility that an item could be labeled 'art' does not necessarily con[fer] First Amendment protection on the item." *Mastrovincenzo,* 313 F.Supp.2d at 289. The observation that *any* object with a size, shape and density has the potential to be art (notwithstanding, we are instructed, the "myopic" perspective of those philistines who recognize art only in its "conventional shapes and forms," *see Bery,* 97 F.3d at 695; *Mastrovincenzo,* 313 F.Supp.2d at 289), is a truism, and, in legal terms, not entirely helpful. To say that the First Amendment protects the sale or dissemination of all objects ranging from "totem poles," *see Mastrovincenzo,* 313 F.Supp.2d at 289, to television sets does not take us far in trying to articulate or understand a jurisprudence of ordered liberty; indeed, it would entirely drain the First Amendment of meaning.[11] The *Bery* Court antic-

**10.** Our decision in *Bery* apparently remains at the forefront of the law concerning First Amendment protection for the sale of "expressive merchandise." *See, e.g., ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915, 924 (6th Cir.2003) (citing *Bery* and holding that "[t]he protection of the First Amendment . . . includes . . . music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures."); *White v. City of Sparks,* 341 F.Supp.2d 1129, 1138 (D.Nev. 2004) ("Only the Second Circuit has gone so far as to award certain visual art—specifically paintings, photographs, prints and sculptures—the full and unquestioned protection of the First Amendment."). Yet, as we have noted above, even *Bery* offered little guidance as to the precise factors that courts should consider when evaluating the expressive capacity of particular goods.

**11.** It is said that during the Bauhaus period, painter Josef Albers would leave a pile of newspapers on a table in his classroom and instruct his students to turn the papers into works of art before he returned in one hour. There would always be one student who, ignoring his classmates' meticulous creations, would simply fold the paper and prop it up like a tent. Albers would then seize upon the tent and exclaim, "[T]his makes use of the soul of *paper.* Paper can fold without breaking. Paper has tensile strength, and a vast area can be supported by these two fine

ipated the line-drawing problem that it bequeathed to successor panels when it airily noted that while future courts would surely find it "difficult at times" to apply the principles expounded in *Bery,* they could nonetheless be counted upon to formulate more precise and workable doctrine. *Bery,* 97 F.3d at 696.

Whatever may be said of *Bery* 's analytic framework, *see, e.g., White v. City of Sparks,* 341 F.Supp.2d 1129, 1139 (D.Nev. 2004) ("Applying such a blanket presumption of protected status [as *Bery* ] would not only be unnecessary ... but would also be out of step with ... the First Amendment's fundamental purpose—to protect *expression.*"), it remains the law of the Circuit until and unless it is effectively superseded by decisions of the Supreme Court or formally revisited by the Court sitting *en banc, see, e.g., United States v. Santiago,* 268 F.3d 151, 154 (2d Cir.2001) (noting that we are bound by a prior panel's holding "unless it has been called into question by an intervening Supreme Court decision or by one of this Court sitting *in banc.*"). We therefore turn to the "difficult" assignment left for us by the *Bery* Court.

At the outset, we must determine whether the sale of plaintiffs' goods is *presumptively* entitled to First Amendment protection, or more precisely, whether the expressive capacity of plaintiffs' goods is such that we automatically apply First Amendment scrutiny to regulations that restrict their sale or dissemination. In *Bery,* we made clear that only certain items—"paintings, photographs, prints and sculptures"—automatically trigger First Amendment review because the sale or dissemination of these items "always com-

municate[s] some idea or concept" to viewers. *Bery,* 97 F.3d at 696. Where, as in the instant case, items do not fall within one of these four categories, their sale must be classified as *potentially* expressive. The *Bery* Court placed in this second category "the crafts of the jeweler, the potter, and the silversmith," whose works "at times have expressive content." *Id.* As the District Court accurately summarized, the *Bery* Court was "unwilling to provide *blanket* protection for all jewelry, pottery and metalwork *because such items do not always communicate an idea or concept to the viewer.*" *Mastrovincenzo,* 313 F.Supp.2d at 289 (emphasis added). Instead, as the District Court observed, "[f]or these and other items, as distinct from paintings, photographs, prints and sculptures, courts must conduct *case-by-case evaluations* to determine whether the work at issue is sufficiently expressive." *Id.* (emphasis added). Accordingly, in the nature of things, some such items ultimately may be characterized as "expressive" while others may be deemed "mere commercial goods"—that is, goods whose characteristics suggest that their vendors are not engaged in protected speech. *See id.* at 285 (distinguishing between "expressive merchandise" and "[m]ere commercial goods").

The District Court's examination of plaintiffs' wares more or less followed this analytical framework. Taken out of context, certain statements by the District Court could be read to suggest that the category of presumptively expressive items extends beyond paintings, photographs, prints and sculptures, *see, e.g., id.* at 286 ("The *Bery* court spoke in terms of paintings, photographs, prints and sculp-

edges. *This!*—is a work of art in paper." Tom Wolfe, From Bauhaus to Our House 14–15 (1981) (emphasis in original).

Plaintiffs essentially ask us to import an Albersian definition of "art" into the First Amendment context. For the reasons set forth in text, we decline to do so.

tures, but clearly held a much broader conception of what qualifies as artistic expression."). But as the District Court's subsequent analysis confirms, its reference to *Bery*'s "broader" conception of artistic expression is merely an acknowledgment that the sale of certain objects not encompassed within the four categories of presumptively expressive items *may* nonetheless be deemed expressive following a case-by-case evaluation of "myriad factors." *Id.* at 292.

In reaching its conclusion that plaintiffs' graffiti clothing is "at least as likely to be understood by some viewers as a Jackson Pollack painting" and just "as expressive as [the works of] any sidewalk calligrapher," *id.* at 291, the District Court explicitly took into consideration five factors: (1) whether the items were "individual[ly] creat[ed] . . . by the particular artist"; (2) "the artist's primary motivation for producing . . . the item"; (3) "the vendor's bona fides as an artist;" (4) "whether the vendor is personally attempting to convey his or her own message"; and (5) "whether the item appears to contain any elements of expression or communication that objectively could be so understood," *id.* at 292. The District Court explained that "[n]o one factor . . . control[led] the outcome," stressing instead that "the criteria fit together to form a matrix." *Id.*

We commend the District Court for seeking, in the difficult circumstances created by our open-ended ruling in *Bery,* to formulate organizing principles for determining when the sale of goods that are not presumptively expressive-*i.e.,* items other than paintings, photographs, prints, and sculptures—should nonetheless be protected under the First Amendment, but we take this opportunity to modify its proposed multi-pronged test to render it consistent with accepted First Amendment principles.

The District Court correctly surmised that while "myriad factors will guide any inquiry into whether a vendor's wares are sufficiently expressive to merit First Amendment protection," this inquiry is "best . . . accomplished by examining [the items] in the light of objective considerations." *Id.* at 292. The District Court incorporated these "objective considerations" into its final and most important factor—namely, whether an item "appears to contain any elements of expression or communication that objectively could be so understood." *Id.* While, for the reasons stated below, we cannot embrace the precise wording of the District Court's final factor—which inquires whether "any elements of expression or communication" are present—we nonetheless agree with the District Court that the most reliable means of determining whether a vendor is primarily engaged in an act of self-expression is not to consult the vendor himself (who will, in most instances, have a strong incentive to emphasize his artistic motivations), but rather to examine the expressive content of the materials being sold.

Were courts to consider (as the District Court suggests) only whether an item could be objectively understood to have *any* expressive or communicative elements, the protections of the First Amendment might then be expanded to encompass the sale of a broad array of merchandise with only incidental artistic elements, including, for example, playing cards with artistic designs on the back, *see People v. Saul,* 3 Misc.3d 260, 776 N.Y.S.2d 189, 192–93 (2004) (holding that playing cards bearing photographs of Iraqi military or political figures were not sufficiently expressive to receive First Amendment protection and thereby to exempt sellers from § 20–453), T-shirts emblazoned with the stars and stripes, *see Mastrovincenzo,* 313 F.Supp.2d at 288 (deny-

ing that such apparel would merit First Amendment protection), or for that matter, *any* object bearing a floral pattern or painted design on its exterior, such as a bicycle, an item of stereo equipment, a garbage can, or a raincoat.

Fortunately, we need not engage in such interesting and creative, but ultimately absurd, intellectual exercises. We live in the real world, with law enforcement decisions being made by policemen on the beat as well as others who must be able to understand the law to be applied without recourse to principles of aesthetics. We therefore apply a test that is as straightforward as we can devise under the circumstances presented.

■ Once a court has determined that an item possesses expressive elements, it should then consider whether that item also has a common non-expressive purpose or utility. Because merchandise that clearly has a alternative, non-expressive purpose—such as the recreational, apparel, and transportation goods mentioned above—is more likely to possess only marginally expressive content or to have been minimally embellished for the purpose of avoiding regulation, courts should exercise greater skepticism in designating such items as "expressive merchandise." The fact that an object serves some utilitarian purpose does not, however, automatically render it non-expressive; rather, upon a finding that the item in question possesses some common non-expressive purpose, a court should then determine whether that non-expressive purpose is dominant or not. Where an object's dominant purpose is expressive, the vendor of such an object has a stronger claim to protection under the First Amendment; conversely, where an object has a dominant non-expressive purpose, it will be classified as a "mere

commercial good[ ]," the sale of which likely falls outside the scope of the First Amendment. *Id.* at 285.

Although we have not, until now, tried to articulate the importance of identifying a dominant expressive purpose for First Amendment inquiries of this kind, this principle is strongly implied by our decision in *Bery*. There, we distinguished a small set of presumptively expressive items—such as paintings, photographs, prints and sculpture—from other, potentially expressive items that we characterized as "crafts"—such as those of the jeweler, the potter, and the silversmith. *Bery*, 97 F.3d at 696. Plainly, the distinction we drew in *Bery* rested upon a perceived difference of dominant purpose: whereas those items in the former group always have dominant expressive purposes, those in the latter group often have dominant non-expressive purposes. A cufflink fastens the cuff and keeps the shirtsleeve from crowding the wrist; a pot serves as a tidy and dry depository for food and other objects, and cutlery (or, for that matter, a silver plate), even if wrought with substantial skill and artistry, most often serves a predominantly non-expressive purpose. In the instant case, the District Court signaled its appreciation for this distinction when it noted that conduct "very often has a dominant non-expressive purpose," but that "genuine art" does not. *Mastrovincenzo*, 313 F.Supp.2d at 287.

Regarding the question of when an item's expressive purpose should be considered "dominant," we have confidence that district courts will prove capable of making such determinations in much the same way that we distinguished between categories of goods in *Bery*, and in the way that courts have dealt on a case-by-case basis with difficult line-drawing problems

in other First Amendment contexts.[12] For those items with common non-expressive uses that are also sold to customers (rather than given away), courts may gauge the relative importance of the items' expressive character by comparing the prices charged for the decorated goods with the prices charged for similar non-decorated goods. If a vendor charges a substantial premium for the decorated work and/or does not sell the item without decoration, such facts would bolster his claim that the items have a dominant expressive purpose. Conversely, objects adorned with only minor artistic adjustments—such as bicycles that have been marked by a splotch of red paint—before being sold at rates indistinguishable from ordinary bicycles, might well be classified as "mere commercial goods" because their expressive character is not dominant.

■ Applying the above framework to plaintiffs' merchandise, we find that plaintiffs' items (1) could be objectively understood to have expressive or communicative elements but (2) also have several clear non-expressive purposes—namely, shielding the eyes and head from the sun, calming and controlling unruly hair. Accordingly, we proceed to consider whether the expressive elements of plaintiffs' items may fairly be characterized as dominant.

Based upon our review of the record, we hold that the plaintiffs' items have a predominantly expressive purpose. Plaintiffs' works "contain text ... depict public figures such as the President or contain logos or designs." *Id.* at 284. Mastrovincenzo's

work includes "decorated baseball caps with such words as 'Boston,' 'Unique,' or 'Uptown' (in a stars and stripes motif) painted across the front." *Id.* at 290. Santos's work includes caps "with words and designs such as 'Bronx' painted in army camouflage colors and accompanied by a partial subway map of the Bronx; ... '1984' in green and purple on a background of vertical black rectangles and black cloud-shaped splotches; and several representational scenes." *Id.* Moreover, we note that "[n]either [plaintiff] sells blank, unadorned hats. Each charges between $10 and $100 per hat ... based on the complexity of the design and effort involved in completing it." *Id.* at 284. While plaintiffs' items clearly have non-expressive uses, we conclude that these non-expressive uses are secondary to the items' expressive or communicative characteristics.

Our conclusion that plaintiffs' wares appear, on their face, to serve a predominantly expressive purpose provides a strong indication that plaintiffs are engaged in protected speech, yet it does not end our inquiry. Rather, we also take into account other factors that shed light on how and why an object is being sold or disseminated. While we decline here to set forth an exhaustive list of all possible factors that courts may wish to consider in future circumstances, which may differ in unpredictable ways from the case at bar, we consider: (1) whether an artist's stated "motivation for producing and selling [an] item" is his desire to communicate ideas,

12. For instance, in the landmark commercial speech case of *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), (overruled on other grounds by several cases in the 1970s) the Supreme Court had no difficulty in applying a New York City regulation prohibiting distribution of handbill advertisements against a plaintiff who, in an effort to circumvent the regulation, had affixed a pro-

test message to the other side of his handbills which advertised paid admission to his Navy submarine.

We expect that courts will likewise be able to identify cases where expressive elements have merely been affixed to items with a dominant non-expressive purpose for the purpose of evading regulation.

*id.* at 292, and (2) whether a vendor (if different from the artist) purports, through the sale of goods, to be engaging in an act of self-expression rather than a mere commercial transaction.[13] Moreover, we specifically reject the District Court's third factor, which takes into account a "vendor's bona fides as an artist" in determining whether an item is expressive merchandise, and in turn, whether its vendors are engaged in protected speech. Because we find no basis in the law of the First Amendment for inquiring into the expressiveness of an item by reference to its creator's curriculum vitae, and because we recognize the potentially undesirable effects of such an inquiry,[14] we expressly reject that element of the District Court's "myriad factors" analysis.

We note that plaintiffs' own testimony concerning their motivation for producing and selling their graffiti items confirms our prior conclusion that they are primarily engaged in acts of self-expression. For example, Santos stated that his "work is *an expression of the particular idea represented* on the work, as well as [his] own upbringing and style as an artist, identifiable as [his] own by the style and techniques used as well as by his signature." Decl. of Kevin Santos ¶ 14 (emphasis added). Santos added that his "artwork is both an important means of personal expression and [his] primary source of income." *Id.* ¶ 21. Along similar lines, Mas-

trovincenzo stated that his "overarching ambition is to *convey a message in a language that people can understand* and relate to, but that has aesthetic qualities that seem to 'flow.'" Decl. of Christopher Mastrovincenzo ¶ 8 (emphasis added). He added that "he began to display and sell [his] hand-painted hats ... as a means of artistic expression" even though they also represent his "primary form of income." *Id.* ¶ 11.

Accordingly, we hold that plaintiffs' graffiti goods serve a predominantly expressive purpose, and their sale is consequently protected under the First Amendment. Yet the conclusion that plaintiffs' items are protected is not tantamount to a finding that New York City's licensing requirement, N.Y.C. Admin. Code § 20–453, violates plaintiffs' First Amendment rights. Rather, to reach the latter question, we must consider (1) whether § 20–453 is a content-based or content-neutral regulation, and (2) whether § 20–453, as applied to plaintiffs, can withstand the corresponding First Amendment scrutiny.

**(B) Whether New York City's Licensing Requirement Violates Plaintiffs' First Amendment Rights**

At the heart of our First Amendment jurisprudence lies the concern "that if the government were able 'to impose content-based burdens on speech,' it could 'effectively drive certain ideas or view-

---

**13.** Here, plaintiffs' testimony concerning their motivations accord with our conclusions drawn from the objective characteristics of the merchandise. We do not suggest, however, that if plaintiffs relied *solely* on their own testimony concerning whether they were engaged in protected speech, such evidence would have been sufficient to trigger First Amendment review where the objective evidence in the record suggested a contrary conclusion. In fact, as we noted earlier, an objective assessment of the characteristics of the merchandise itself will generally be the most reliable evidence of whether an individual merchant is engaged in protected speech.

**14.** The District Court's third factor could easily be used to deprive First Amendment protection to artwork otherwise considered indisputably expressive. For example, a painting sold on a sidewalk of New York City that was painted by the proverbial "amateur" who lacked any sort of recognizable "bona fides," would fare less well under the District Court's "myriad factors" test than would the identical artwork of a more "credentialed" artist.

points from the marketplace.'" *Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir.2005) (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)). As a safeguard against government censorship, we consider "regulations of speech based on its content [to be] presumptively invalid," *id.* at 149 (internal quotation marks omitted), upholding such regulations only if they withstand strict scrutiny.[15] On the other hand, we apply "intermediate scrutiny" to

> regulations of expressive activity that are not based on content. Content-neutral regulations may limit the time, place, or manner of expression—whether oral, written, or symbolized by conduct—even in a public forum, so long as the restrictions are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information.

*Id.* (internal quotation marks and citations omitted).

■ In this "intermediate scrutiny" context, by "narrowly tailored to serve a significant governmental interest," *id.*, we do not mean to imply that a regulation must be " 'the least restrictive or least intrusive means of [achieving the stated governmental interest],' " *id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Rather, "[t]he narrow tailoring requirement is satisfied so long as the ... [content-neutral] regulation promotes a substantial governmental interest that *would be achieved less effectively absent the regulation.*" *Id.* (emphasis added) (internal quo-

tation marks omitted). A content-neutral "time, place or manner" restriction will be considered narrowly tailored unless "a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

■ "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Hobbs*, 397 F.3d at 149 (internal quotation marks omitted). Provided that a regulation "serves purposes unrelated to the content of expression," it will be deemed content-neutral, "even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791, 109 S.Ct. 2746. Regulations that target "only [the] potentially harmful secondary effects of speech" are therefore content-neutral and trigger intermediate, rather than strict, scrutiny. *Hobbs*, 397 F.3d at 150.

The District Court, in reviewing plaintiffs' First Amendment claims, improperly truncated its analysis, resting its holding almost exclusively on its finding that plaintiffs' sale of artistic items qualifies as protected speech and paying less attention to the equally important question of whether § 20–453 is a valid "time, place or manner" restriction. Tellingly, the District Court inquired whether plaintiffs' items "possess sufficiently expressive qualities to qualify for First Amendment protection *and thereby become exempt from the Ordinance's licensing requirement.*" *Mastrovincenzo*, 313 F.Supp.2d at 286 (emphasis added). The District Court's only discussion of the validity of § 20–453 consisted of the following paragraph:

---

15. Under the strict-scrutiny test (which we do not apply in the instant case) "a content-based restriction may be upheld if the restriction serves a compelling governmental interest, is necessary to serve the asserted [compel-

ling] interest, is precisely tailored to serve that interest, and is the least restrictive means readily available for that purpose." *Hobbs*, 397 F.3d at 149 (internal quotation marks and citation omitted) (alteration in original).

The City's licensing requirement was intended to catch within its net merchants engaged solely in commerce of ready-made goods that clog the sidewalks and compete unfairly with legitimate stores. Applied overbroadly, as Defendants would do, the Ordinance essentially would impose a chilling effect on genuine artists whose true calling is art and not commerce, and whose manifest purpose may be to create expression rather than markets, even if at times some of their work may skirt the line between expressiveness and merchandise. Such an extension of the licensing regime would force artists to confront an undue dilemma: either to quell their creativity or to risk arrest if they believe their work is sufficiently expressive to fall within the protection of the First Amendment. Freedom of expression is designed precisely to bar the government from compelling individuals into that speech-inhibiting choice.

*Id.* at 292–93.

▮▮▮ Whatever rationale the District Court may have used in reaching its conclusion that § 20–453 is "[a]pplied overbroadly," we disagree with its conclusion. We begin with the observation that New York City's licensing requirement is clearly a content-neutral speech restriction because it "serves purposes unrelated to the content of [the regulated] expression," *Hobbs*, 397 F.3d at 150 (internal quotation marks omitted), namely: (1) keeping the public streets free of congestion for the convenience and safety of its citizens, (2) maintaining the "tax base and economic viability of the City," and (3) preventing the sale of "stolen, defective or counterfeit merchandises," *see Mastrovincenzo*, 313 F.Supp.2d at 283 (quoting New York City Local Law 40/1988 § 1). While § 20–453 undoubtedly has "incidental" or "harmful secondary effects" on plaintiffs, these do not render the regulation content-based because it may still be "justified without reference to the content of the regulated speech." *Hobbs*, 397 F.3d at 149 (internal quotation marks omitted).[16]

The mere fact that New York City differentiates between *categories* of vendors—that is, vendors of written materials, paintings, photographs, prints and sculptures are exempt from its licensing requirement while other vendors are not—does not suggest that the City's regulation targets particular messages and favors others. Nor does § 20–453 "confer unbridled discretion on the licensing authority" enabling that authority "to favor some speakers while suppressing others." *White v. City of Sparks*, 341 F.Supp.2d 1129, 1141 (D.Nev.2004) (internal quotation marks and citation omitted). Unlike a licensing scheme in which "there are no limiting criteria or standards" for when a license will be required, *cf. id.* at 1142 (striking down a city regulation that makes licensing requirements contingent on a city official's determination of whether a particular painting "conveys a religious, political, philosophical or ideological message") (internal quotation marks omitted), New York City's licensing requirement applies across the board to all non-exempt vendors, *i.e.* vendors whose goods and services are neither food items, written materials, or items specifically mentioned in the *Bery*

---

16. In *Bery*, we considered § 20–453 a "time, place or manner" restriction, but in dicta expressed some doubt as to whether the licensing requirement, as then formulated, was content-neutral given the City's application of the requirement to vendors of visual art but not to vendors of written materials. *Bery*, 97 F.3d at 696 ("It is not clear that this ordinance is content-neutral [because] it distinguishes between written and visual expression ...."). We now resolve that ambiguity and hold that § 20–453, in its current form, is a content-neutral regulation that triggers intermediate scrutiny.

injunction (paintings, photographs, prints and sculptures). Furthermore, plaintiffs do not allege any discriminatory enforcement against certain non-exempt vendors based on the content of their art.

There can be no doubt that New York City's avowed objectives in enforcing its licensing requirement, such as reducing sidewalk and street congestion in a city with eight million inhabitants, constitute "significant governmental interests." Nor have plaintiffs or the District Court denied that a fixed-ceiling licensing requirement represents a "reasonable" means of controlling that congestion. The dispositive issue, therefore, is whether the significant governmental interests that § 20–453 promotes " 'would be achieved less effectively absent the regulation,' " *Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)), or whether instead "a substantial portion of the burden on speech does not serve to advance its goals," *id.*

■■■ We hold that § 20–453, as applied, survives intermediate scrutiny because it a valid "time, place, or manner" restriction that, while perhaps not the least speech-restrictive means available, is narrowly tailored and leaves regulated parties with "ample alternative channels" of communication.[17] New York's 853–license limit was established in 1979 pursuant to Local Law No. 50, which amended Section 20–459(a) of the Administrative Code. *See Bery*, 906 F.Supp. at 168. In deciding to limit the number of vendors' licenses to 853, the City Council explained that, based upon its assessment of local conditions, "a limit on the total number of general vendor licenses should be established, because the business of general vending is *intimately connected with problems of congestion on streets and sidewalks*, and because *an increase in the number of general vendors would worsen those conditions*." N.Y.C. Local Law 50 of 1979, § 1 (emphasis added). We ought not to second-guess a decision by the City Council—the elected representatives of the people of New York City—in the legitimate exercise of its recognized authority, to promote the public interest through local legislation, *see* Background, I, *ante* (citing Charter of the City of New York, § 21), that a fixed-license system is appropriate or necessary. Nor is there any evidence to suggest that the City's licensing requirement is mere surplusage in light of those *other* "time, place, or manner" restrictions contained in the GVL (such as those governing spacing between vendors), that also help reduce congestion in the city streets.

Although, at this time, § 20–453 would prevent plaintiffs from selling their items, they are able to add their names to the license "waiting list" or petition the City Council to raise the number of permits, as the City has seriously considered doing on at least one occasion. *See* Tr. of Hearing on Alternatives to the Licensing of Artists Before the City Council Comm. on Consumer Affairs, Nov. 23, 1993, at 16–24 (discussing, but declining to adopt alternatives to New York City's licensing scheme, such as San Francisco's repeat-lottery system). Section 20–453 does not operate as

---

17. Our narrow-tailoring inquiry requires us "to apply principles of First Amendment jurisprudence to the specific facts of this case," and therefore we treat this issue as a mixed question of law and fact that we may resolve on appeal. *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227 n. 1 (9th Cir. 1990). Because the record provides sufficient information to make an informed legal determination, we conclude that a remand to the District Court on the question of narrow-tailoring would be unnecessary, and indeed, would only prolong this litigation by promoting further appeals to this Court on the question of narrow-tailoring in the future.

an absolute bar against the sale of expressive items such as plaintiffs'; rather, the law merely prevents *unlicensed* vendors from selling such items on New York City streets and sidewalks.

Finally, § 20–453 leaves open "ample alternative channels" of communication. The requirement that "ample alternative channels" exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed "ample." *See Connection Distrib. Co. v. Reno,* 154 F.3d 281, 293 (6th Cir. 1998) ("[T]he requirement that ample alternative channels be left available does not mean that there must be a channel where [plaintiffs] can express themselves in precisely the same manner as before the regulation."); *see also Heffron v. Int'l Soc'y For Krishna Consciousness,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places and in any manner that may be desired."); *Poulos v. New Hampshire,* 345 U.S. 395, 405, 73 S.Ct. 760, 97 L.Ed. 1105 (1953) ("The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction.").

Although we suggested in *Bery* that "[t]he sidewalks of the City must be available for [artists] to reach their public audience," *Bery,* 97 F.3d at 698, we note that § 20–453 in no way precludes plaintiffs from reaching public audiences on the sidewalks generally, or in any of the specific venues where they currently hawk their wares. Notwithstanding New York City's licensing requirement, plaintiffs may personally distribute their art to the public free of charge, or, should they wish to turn a profit, they may enlist licensed vendors to sell their clothing.[18] At most therefore, § 20–453 prohibits plaintiffs, as unlicensed vendors, from *personally* selling their wares *for a profit* and *at a venue of their choosing.*

In addition to these options, the record reveals that plaintiffs have numerous alternative channels through which to share their art with the public. While Mastrovincenzo stated that his inability to obtain a license for street-side sale of his graffiti clothing prevents him from "selling [his] artwork as often as [he] would like to and in the more desirable locations," *id.* ¶ 25, he nonetheless acknowledged that he possesses opportunities to "display and sell [his] work at galleries, clubs and trade shows," in "freelance jobs for both individual and corporate clients," as well as on "themed murals." Decl. of Christopher Mastrovincenzo ¶ 17. In the past, Mastrovincenzo has also been commissioned to paint business cards, storefronts, and commercial signs. *Id.* ¶ 5.

Likewise, Kevin Santos has already taken advantage of opportunities to display his work in "a number of different venues." Decl of Kevin Santos ¶¶ 8. These include (1) art "show[s] and exhibition[s]" some of which allow his work to remain on "permanent display," (2) "a number of galleries in New York City," (3) documentary films, and (4) displays at the New York Historical Society. Decl. of Kevin Santos

---

18. Upon discovering that he could not directly sell items to the public without a license, Santos "arranged for licensed vendors to sell his completed works on commission." *Mastrovincenzo,* 313 F.Supp.2d at 284.

¶¶ 8–11.[19]

Because the First Amendment does not require that New York City permit plaintiffs to sell their work directly to the public in an ideal venue, and because we conclude that the alternative avenues of communication available to plaintiffs, taken together, are more than "ample," we hold that § 20–453 satisfies intermediate scrutiny and does not violate plaintiffs' First Amendment rights.

We are not bound here by our conclusion in *Bery* that "[t]he license requirement *as it relates to [the Bery plaintiffs], which effectively bars them from displaying or selling their art on the streets*, is too sweeping to pass constitutional muster." *Bery*, 97 F.3d at 697 (emphasis added). As described above, whether a regulation is narrowly tailored can only be determined by considering the scope of its application relative to the government objectives being pursued, taking context into account. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1140 & n.52 (9th Cir.2005) (endorsing a "pragmatic application of the ample alternatives test" that focuses on the particular context in which speech restrictions are applied). Therefore, the *Bery* Court's conclusion as to whether § 20–453 was narrowly tailored in its application to vendors of paintings, photographs, prints, and sculptures does not dictate our conclusion as to whether § 20–453 is narrowly tailored in its application to the differently-situated plaintiffs in this case, who are vendors of regular merchandise with sufficient expressive content to qualify for First Amendment protection. We have never addressed that question, and we consider it here as a matter of first impression.

The types of wares at issue here, whose dominant purpose is not clearly expressive, present line-drawing questions markedly distinct from the more-easily-classified "paintings, photographs, prints and/or sculpture" at issue in *Bery*, and we are therefore persuaded that the "least restrictive or least intrusive means of [achieving the stated governmental interest]," *id.* (internal quotation marks omitted), in *this* context is likely to be more burdensome than it would be with respect to the traditional art forms at issue in *Bery*. For this reason, and in light of information in the record concerning alternative avenues of communication available to these specific plaintiffs, we believe that notwithstanding *Bery*, § 20–453 is sufficiently narrowly tailored to satisfy intermediate scrutiny here.

For the reasons stated above, we reverse the District Court's holding that plaintiffs are likely to succeed on the merits of their First Amendment claim.

### III. The *Bery* Injunction

■ The District Court concluded, as an adequate and independent basis for its holding, that plaintiffs would also likely succeed on their *Bery* injunction claim. In short, the District Court held that plaintiffs' hats, jackets, and other clothing are "paintings" within the meaning of the *Bery* injunction, which was the product of a settlement in which the City of New York agreed not to enforce its licensing requirement against "any person who hawks, peddles, sells, leases or offers to sell or lease, at retail, *any paintings*, photographs, prints and/or sculpture . . . in a public space," Permanent Injunction on Consent dated Oct. 21, 1997, *Bery v. City of New York*, No. 94 Civ. 4253(MGC) (S.D.N.Y. Oct. 30, 1997) (emphasis added). According to the District Court, plaintiffs' items are properly considered "paintings" because "[t]he original application of pigment to an article of clothing done for expressive reasons by an artist is . . . a painting," and "[a] painting does not lose its definition as painting . . . when it appears on

19. In addition, we take judicial notice, pursuant to Federal Rule of Evidence 201(b), of the obvious fact that the Internet may provide an alternative outlet for the sale of plaintiffs' merchandise.

something other than a framed canvas." *Mastrovincenzo*, 313 F.Supp.2d at 293.

Because the *Bery* injunction was a court-approved agreement, and because we construe such agreements according to the general interpretive principles of contract law, *see, e.g. Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 307 (2d Cir.1996), we defer "'to the plain meaning of the language ... and the normal usage of the terms selected.'" *City of Hartford v. Chase*, 942 F.2d 130, 134–35 (2d Cir.1991) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985)) (alteration in original). As with any other contract, we may rely upon "certain aids to construction" such as "the circumstances surrounding the formation of the consent order." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). Ultimately, our task is not to divine the Platonic form of a "painting," but to determine, as best we can, how broadly the parties to the *Bery* injunction intended "painting" to be construed and whether their understanding of "painting" may fairly be said to encompass plaintiffs' items.

Plaintiffs draw our attention to a dictionary definition of the noun "painting" as "something produced through the process or art of painting." *See* Appellees' Br. at 17 (quoting Webster's Third New Int'l Dic-

tionary of the English Language Unabridged 1621 (2002)). In turn, plaintiffs define the verb "to paint" as being: "to color all or part of (a surface) by or as if by applying a pigment." *Id.* The District Court's interpretation of the term "painting" was similarly broad, suggesting that any item to which pigment had been applied falls within the meaning of the word "painting." *See Mastrovincenzo*, 313 F.Supp.2d at 293.[20]

We hold that the term "paintings" as used in the *Bery* injunction does not include baseball caps, jackets, and other articles of clothing that have been artistically decorated with paints and markers. While such items may properly be considered "expressive merchandise," *see* Discussion, II(A), *ante*, and may fit within their sellers' *own* broad definition of "paintings," we cannot agree with the District Court that a court-approved settlement affording First Amendment protection to "paintings, photographs, prints and/or sculpture" encompasses clothing—or indeed, any item—that has been embellished by the application of pigment.

At the level of plain meaning and normal usage, we disagree that the term "paintings"—or the phrase "any paintings," for that matter[21]—refers to the entire uni-

---

**20.** Our colleague writing separately sets forth two similarly broad definitions of "painting," the first of which encompasses any "representation on a surface executed in paint or colours" while the second includes any "work produced" through "[t]he process, art, or occupation of coating surfaces with paint." *Post*, at [107] (quoting the Oxford English Dictionary and American Heritage Dictionary of the English Language). While our colleague concedes that "the word 'painting' hardly applies to 'any item to which pigment has been applied,'" *post* at [107] (quoting Majority Op. at [103]), the definitions upon which he relies admit of no clear limiting principle. Consequently, our colleague's interpretation of the *Bery* injunction appears

either to encompass any "surface" to which paint has been applied or to leave unclear the distinction between paintings and non-paintings. Because we cannot agree that the parties intended to adopt such an expansive or imprecise definition in the text of the injunction, we decline to interpret the term in such a broad, open-ended manner.

**21.** We reject the position of plaintiffs, *see* Appellees' Br. at 16–17, that we ought to interpret the use of "any" to mean "any items to which paint is applied." Rather, we interpret the term "any" to mean that there can be no discretionary distinctions *among* those items that otherwise fall within the *Bery* injunction's definition of "painting." For example, the

verse of goods to which paint may be applied. Notwithstanding the existence of a dictionary definition to the contrary, "paintings," as it is more frequently used and understood in common parlance, refers not to all goods that are "painted" but only and specifically to painted canvases. The structure of the *Bery* injunction confirms this conclusion. Were we to import the plaintiffs' proposed definition of "paintings" into the *Bery* injunction, the document would read "any items to which pigment has been applied, photographs, prints and/or sculpture[,]" thereby disrupting the parallelism of the four discrete categories to which the *Bery* injunction specifically refers.

Whatever ambiguity may remain after examining the plain meaning, normal usage, and structure of the *Bery* injunction is definitively resolved by considering the circumstances surrounding its formulation. To adopt plaintiffs' broad interpretation of the term "painting" (anything to which pigment has been applied) would be to suppose that the City of New York, in signing the *Bery* injunction, meant to authorize the unlicensed sidewalk sale of an almost unlimited array of painted goods.[22] In other words, plaintiffs' reading would transform an otherwise narrow exception granted to four specific kinds of artwork into an "exception that swallows the rule,"

as virtually all goods would be exempted. In another context, when interpreting contracts under New York state law, we held that the " 'cardinal principle for the construction and interpretation of . . . all contracts . . . is that the intentions of the parties should control. Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.' " *World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir.2003) (quoting *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir.1986)). Here, we conclude that it would be absurd to infer that New York City intended to waive its licensing requirement by adopting such an expansive definition of "paintings" as plaintiffs now propose.[23]

Looking to the facts of the *Bery* case itself provides further confirmation that the *Bery* injunction did not understand or intend "paintings" to encompass the full spectrum of painted goods. The complaint filed by the *Bery* plaintiffs refers to "Plaintiff Max Moran" as a "trained fine artist" who has "been harassed and issued a summons for exhibiting his paintings without a license." *Bery* Compl. ¶ 8. In describing Mr. Moran's works in further detail, the Complaint states that "Central Park was 'the focus' of Mr. Moran's painting" and

---

*Bery* injunction applies to poorly executed paintings, offensive paintings, large and small paintings. But stipulating that there can be no distinctions drawn *within* an identified group does not imply an expansion of the outer boundaries of that group.

22. For instance, plaintiffs' interpretation, taken to its logical extent, would support the unlicensed sale of new BMW "art cars" or "rolling canvases" painted by commissioned artists, *see* Decl. of Henry Chalfant ¶ 20 [A 178], or even ordinary vehicles with factory paint jobs. We cannot in good faith glean this sort of an outcome from the *Bery* injunction.

23. Assuming *arguendo* that the *Bery* plaintiffs actually intended "paintings" to include all objects to which paint has been applied, they did not include any language in the *Bery* injunction itself specifying that this was their understanding. Because we hold that the plain meaning, normal use, structure, and circumstances surrounding the creation of the *Bery* injunction suggest that "paintings" was understood to have a narrower meaning, we are persuaded that the *Bery* plaintiffs bore the burden of providing such a "clarification" if indeed they desired a broader scope to the injunction.

that Moran "decided to display his *finished canvases* along the stone walls of Fifth Avenue" before he was confronted by a police officer who, he alleges, "kicked his paintings," causing him to "retreat from that part of the Park." *Id.* ¶¶ 42–43 (emphasis added). The interchangeable use of "paintings" and "finished canvases" suggests that the "original paintings" to which the district court referred in *Bery* were not painted goods of some unspecified nature, but rather, painted canvases of the sort normally brought to mind by the term "paintings" when used without further qualification. *See Bery*, 906 F.Supp. at 165.[24]

Finally, we note that in the course of its constitutional discussion, the District Court itself assumed without hesitation that plaintiffs' items do not qualify as "paintings," at least as that term was understood by the *Bery* court. *See Mastrovincenzo*, 313 F.Supp.2d at 288 n. 4, 289–92. As defendants point out, "[i]f a painted hat constituted a painting as a matter of law, then such a hat would be a painting and must automatically [have] receive[d] 'full First Amendment protection'" pursuant to *Bery's* discussion of presumptively expressive merchandise. Appellants' Br. at 18. Instead, the District Court assumed that plaintiffs' items were *not* presumptively expressive, *see Mastrovincenzo*, 313 F.Supp.2d at 288 n. 4 ("But items such as those that Plaintiffs produce *do not carry the same presumption*, and so the Court must inquire into their expressiveness.") (emphasis added),

and instead considered "myriad factors" in determining whether plaintiffs' "wares are sufficiently expressive to merit First Amendment protection." *Id.* at 292. Had plaintiffs' items actually constituted "paintings" as that term was understood at the time *Bery* was decided, the District Court's application of a "myriad factors" test for potentially expressive merchandise would have been entirely unnecessary.

For the foregoing reasons, we hold that the District Court erred by finding that plaintiffs' items are covered by the *Bery* injunction.[25]

### CONCLUSION

In sum, we hold that:

(1) the sale of clothing painted with graffiti is not necessarily expressive and therefore is not automatically entitled to First Amendment protection;

(2) the sale of plaintiff's clothing nonetheless has a predominantly expressive purpose and therefore merits First Amendment protection;

(3) New York City's licensing requirement is a content-neutral restriction on speech that is narrowly tailored to achieve the objective of reducing urban congestion; and

(4) the *Bery* injunction's reference to "paintings" does not encompass clothing painted with graffiti.

Accordingly, we vacate the order of the District Court preliminarily enjoining de-

---

**24.** Robert Bery is described in the Complaint has having sold "mixed media paintings," *see* Bery Compl. ¶ 39, which are paintings that use "two or more media in a single work of art, for example, the combining of watercolor and gouache." Harper Collins Dictionary of Art Terms and Techniques (2d ed.1969). While the term "mixed media paintings" does not explicitly specify a traditional canvas, it clearly does not refer to mere painted goods.

**25.** Plaintiffs have also raised claims under Article 1 of the New York State Constitution. Due to the nature of its decision, the District Court did not reach these arguments. *Mastrovincenzo*, 313 F.Supp.2d at 294. Accordingly, these claims are not properly before us on appeal, and we decline to address them here.

fendants from enforcing New York City Municipal Code § 20–453 against plaintiffs. The cause is remanded to the District Court for further proceedings consistent with this opinion.

SACK, Circuit Judge, concurring in part and dissenting in part.

## I.

I agree with the principal conclusions reached by the majority in Judge Cabranes's thoughtful and thorough opinion resolving this difficult appeal. In particular:

First, I agree with the opinion's approach to analyzing whether the sale by the plaintiffs of their works is entitled to First Amendment protection by asking, *inter alia,* whether such a sale has a "dominant expressive purpose." *Ante,* 435 F.3d at 95. Although some better test may come along one day, the panel's methodology seems to me to be flexible enough to accommodate the protean nature of art and expression and the infinitely varying circumstances in which the question may arise.[1]

I thus also agree with the panel's decision to "decline here to set forth an exhaustive list of all possible factors that courts may wish to consider in future circumstances, which may differ in unpredictable ways from the case at bar." *Ante,* 435 F.3d at 96. It would be difficult to adopt such a multi-part test concrete enough to work in these circumstances but adaptable enough to apply satisfactorily to

unforeseeable future cases. Although it was said in the context of First Amendment protection for freedom of religion, I agree with Justice Breyer's observation, concurring in judgment in *Van Orden v. Perry,* —— U.S. ——, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005): "[O]ne will inevitably find difficult borderline cases. And in such cases, I see no test-related substitute for the exercise of legal judgment." *Id.* at 2869 (Breyer, J., concurring in judgment).

Second, I agree, for reasons adverted to by the majority, that the plaintiffs' sale of their works has a dominant expressive purpose and is therefore entitled to full First Amendment protection.

Third, I agree with the panel majority that although the sale of the plaintiffs' works is thus protected by the First Amendment, it is, like the protected dissemination of other speech, subject to non-content based, reasonable "time, place and manner" restrictions. *See ante,* 435 F.3d at 98.

## II.

I disagree not with the majority's First Amendment analysis, then, but only with (1) its conclusions regarding the impact of the *Bery* Injunction, *see Bery v. City of New York,* 97 F.3d 689, 696 (2d Cir.1996); Permanent Injunction on Consent, dated October 21, 1997, *Bery v. City of New York,* No. 94 Civ. 4253 (S.D.N.Y. Oct. 30, 1997) (the "*Bery* Injunction"), and (2) its conclusion that we may determine in the first instance that the ordinance is a rea-

---

1. Although our opinion in *Bery v. City of New York,* 97 F.3d 689, 696 (2d Cir.1996), used the phrase "expressive merchandise," I agree with the panel opinion that some form of "dominant expressive purpose" test more accurately captures the relevant inquiry. *See ante,* 435 F.3d at 85 n.4; 87 n.6. A piece of yellow ribbon may arguably not constitute "expressive merchandise" yet still have a dominantly expressive purpose if used by its

creator or distributor to express his or her concern for American service men and women. Conversely, it seems to me that a vendor's sale by the score of "expressive merchandise," such as cast-iron Statues of Liberty or "I ♥ N.Y." T-shirts (not to say a buyer's purchase, wearing, or *display* of the item for expressive purposes), may not warrant full First Amendment protection if their

sonable time, place or manner restriction in this context.

### A.

Under the *Bery* Injunction, the *Bery* defendants, including the City, the Department of Consumer Affairs, and the Police Department, are "permanently enjoined from enforcing Administrative Code § 20–453 [the general vendor licensing requirement] against any person who hawks, peddles, sells, leases or offers to sell or lease, at retail, any paintings, photographs, prints and/or sculpture, either exclusively or in conjunction with newspapers, periodicals, books, pamphlets, or other similar written matter, in a public space." *Bery* Injunction, at 2. The preliminary question for us is whether, under those terms, the plaintiffs must be allowed to sell their works on city sidewalks and streets without a license. Unlike the majority, I think the answer is in the affirmative.

I agree with the majority that the word "painting" hardly applies to "any item to which pigment had been applied," *ante,* 435 F.3d at 104, but I do not think that the word refers "only and specifically to painted canvases," *id.* It seems to me that the plaintiffs' works, which would undoubtedly have been "paintings" had they been applied to paper or canvas, remain paintings when they are applied to another surface, even one that shares more mundane uses, such as a blank hat.

I am generally reticent to invoke dictionary definitions, at least in contexts perhaps unforeseen by their writers, but I note that the definition of the verb "to paint" in the Oxford English Dictionary is "[t]o represent (an object, scene, etc.) or portray (a person or thing) on a surface, using paint or other colouring matter." Oxford English Dictionary (Draft Revision, Mar. 2005), *available at http://dictionary.oed.com* (last visited Dec. 13, 2005).[2] Similarly, although visual artworks referred to as "paintings" are traditionally executed on canvas or paper, the noun "painting" is more broadly defined. The Oxford English Dictionary defines it as "a representation on a surface executed in paint or colours; a painted picture or likeness." *Id.; see also* American Heritage Dictionary of the English Language (4th ed.2000), *available at http://www.bartleby.com/61/64/P0016400.html* (last visited Dec. 13, 2005) ("1. The process, art, or occupation of coating surfaces with paint for a utilitarian or artistic effect. 2 A picture or design in paint."); Merriam Webster Online Dictionary, *at http://www.m-w.com* (last visited Dec. 13, 2005): ("1: a product of painting; *especially.* a work produced through the art of painting.") (emphasis in original). These definitions do not suggest that a painting is a "painting" only if it is executed on canvas, paper, or some other similarly non-utilitarian medium.

Indeed, there are of course famous paintings on ceilings and walls of buildings that are indisputably great works of "art" I do not think, and I doubt the majority's "dominant expressive purpose" test (with which I am in agreement) requires, that the fact that these works were painted on parts of buildings that also serve the utilitarian purposes of holding up a roof or keeping out the elements would disqualify them as "paintings" under the *Bery* Injunction (assuming for these purposes that

dissemination does not have a dominant expressive purpose.

**2.** One of the definitions given by Webster's Third New International Dictionary for the verb "paint" is "to make or produce (as a picture, sketch, design) in lines and colors on a surface (as a canvas or wall) by brushing on or similarly applying pigments," thus referring to "canvas" as an example of a surface on which a painting may be executed. *Id.,* available at *http://mwu.eb.com* (last visited Dec. 13, 2005).

anything remotely resembling Da Vinci's "The Last Supper" or Michelangelo's Sistine Chapel paintings are capable of being sold from push-carts on the streets of New York).[3] In other words, I do not see why an original painting on a blank hat, if painted with a dominant expressive purpose, is any less a "painting" for the purposes of the *Bery* Injunction than are the endless, mass-produced "prints," the dissemination of which is now exempt from the City's licensing requirement.

Moreover, I see no persuasive reason for the word "painting," as used in the *Bery* Injunction, to be interpreted narrowly. The parties did not indicate any such limiting definition in the Injunction. Although the *Bery* opinion does not precisely define such terms as "paintings," "photographs," "prints," or "sculptures," *see* 97 F.3d at 696, the context of the decision indicates that they should be read broadly. The Injunction, after all, was entered into after *Bery* reversed the district court's denial of a preliminary injunction for the plaintiffs. In so doing, the court broadly proclaimed that "[v]isual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection." *Id.* at 695. The Injunction was thus designed to protect a wide swath of expressive speech and

ought to be read with correspondingly broad meaning.[4]

### B.

I also disagree with the majority's decision, given the current posture of the case, that the ordinance is a reasonable time, place or manner restriction *as a matter of law*. Instead, I think the question of its reasonableness should be presented to the district court on remand. As Judge Cabranes's opinion makes clear, reasonable "time, place and manner" restrictions are constitutionally permissible with respect to expression generally, no matter how clearly protected, profound, or unpopular. A painstaking analysis of such restrictions is therefore necessary to guarantee that they do not impinge unacceptably on free expression.

The majority criticizes the district court for having "truncated its analysis, resting its holding almost exclusively on its finding that plaintiffs' items qualify as protected speech and paying less attention to the equally important question of whether § 20–453 is a valid 'time, place or manner' restriction." *Ante*, 435 F.3d at 98. Yet I see nearly nothing in the record, and too little in the majority opinion, to convince me that the ordinance at issue here, as applied to these plaintiffs, is "reasonable"

---

3. To be sure, experts might, in some circumstances, refer to such a painting as a "fresco." But the Oxford English Dictionary tells us that a fresco is *"[a] kind of painting* executed in water-colour on a wall, ceiling, etc. of which the mortar or plaster is not quite dry, so that the colours sink in and become more durable. Orig. in phrase *(to paint) in fresco."* Oxford English Dictionary (2d ed.1989), *available at http://dictionary.oed.com* (last visited Dec. 13, 2005) (first emphasis added; other emphasis in original).

4. Interestingly, perhaps, it would appear that Robert Bery, the lead plaintiff in the case, creates multimedia works that combine paint-

ing, photography, video, and computer graphics—including early works involving oil and silver emulsion on wood and more recent works using chromium with acrylic on transparencies, *see http://www.beryarts.com* (last visited Dec. 13, 2005). I would think it likely that such works would qualify as "paintings" under the *Bery* Injunction even though they are not representations on canvas or paper. Maybe the City defendants hoped that the terms of the Injunction would be understood narrowly, but there is no reason to think that the artists who effectively won the case would have had in mind a narrow conception of "painting" when they entered into it.

as a matter of law. Importantly, for example, I do not think we know enough to decide whether the ordinance leaves the plaintiffs with "ample alternative channels" of communication. It seems to me speculative to conclude on the basis of what we have before us that licensing vendors to sell works, or using homes, galleries, museums, or the Internet to disseminate plaintiffs' works, constitutes the "ample alternative channels" that are required.

We decided in *Bery,* 97 F.3d at 697–98, that as a matter of law, this same ordinance was unreasonable as applied to the sale of the artworks by the plaintiffs there. In the course of reaching that conclusion, we stated that "[t]he City ha[d] ... failed to meet the requirement of demonstrating alternative channels for [the artists'] expression." *Id.* at 698.[5] I do not see how, in the face of that conclusion, we can decide, as a matter of law, that the plaintiffs have sufficient alternative channels for disseminating their work to render the same ordinance reasonable here.[6]

I would thus conclude that the constitutional consequences of the "reasonableness" determination require that the remand include an instruction to the district court to conduct the fact-intensive inquiry necessary to determine the reasonableness of the ordinance's restrictions under these circumstances. *Cf. Johnson v. California,* 543 U.S. 499, 125 S.Ct. 1141, 1152, 160 L.Ed.2d 949 (2005) (reversing and remanding for the lower court to apply the correct legal standard in the first instance); *Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 557–558, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) (same); *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1031–1032, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (same).[7]

### III.

Finally, I note that I do not necessarily disagree with the ultimate conclusion of the majority's decision—that the First Amendment does not entitle the plaintiffs to sell their works without a license on New York City sidewalks and streets. I

---

**5.** According to the *Bery* court:
   [T]o tell [the artists] that they are free to sell their work in galleries is no remedy for them. They might not be at a point in their careers in which they are interested in reaching the public that attends exhibits at art galleries—if, indeed, they could get their works accepted for showing. Appellants are interested in attracting and communicating with the man or woman on the street who may never have been to a gallery and indeed who might never have thought before of possessing a piece of art until induced to do so on seeing appellants' works. The sidewalks of the City must be available for appellants to reach their public audience.
   *Bery,* 97 F.3d at 698.

**6.** I understand that were the case to be returned to the district court for it to address these issues, we would likely be required to review the district court's decision de novo. *See Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996). That does not mean that we should decide these issues without prior input

from the district court. *See Beckford v. Portuondo,* 234 F.3d 128, 130 (2d Cir.2000) (per curiam) (observing that even though we review a grant of summary judgment de novo, "that does not mean that it is our function to decide motions for summary judgment in the first instance. We are dependent on the district court to identify and sort out the issues on such motions, to examine and analyze them, and to apply the law to the facts accepted by the court for purposes of the motion. We are entitled to the benefit of the district court's judgment, which is always helpful and usually persuasive.").

**7.** If the case were being remanded to the district court on the "reasonableness" issue, perhaps it would be the better course also to ask the district court to determine in the first instance whether the dissemination of the plaintiffs works is for a dominant expressive purpose. Under the circumstances, though, the issue is academic.

differ in my views only as to how the City must proceed to achieve that end.

I would remand the case to the district court to permit the City to seek relief there from, or clarification of, the scope of the sweeping consent injunction, which may have been entered into improvidently. *See* Fed.R.Civ.P. 60(b). In the course of that proceeding, it would be the City's burden to demonstrate that the ordinance was a valid time, place or manner restriction, which it might be able to carry. But for now, I see no reason why "painting" does not include the plaintiffs' paintings, nor can I comfortably conclude, on the present record, that the ordinance is constitutional as applied to the dissemination of the plaintiffs' works.

For those reasons and to that extent, I respectfully dissent.